[Cite as *State v. Smith*, 2018-Ohio-2504.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170028 |
| | | TRIAL NO. B-1505510 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| WILLIAM ANTONIO SMITH, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed and Cause Remanded

Date of Judgment Entry on Appeal: June 27, 2018

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela M. Stagnaro*, for Defendant-Appellant.

**CUNNINGHAM, Judge.**

{¶1}    Following a jury trial, defendant-appellant William Antonio Smith appeals from his convictions for the murders of Alma Jean Owens and MacArthur Jackson, Sr.  The 27-year-old Smith admitted killing his longtime friends in Jackson's apartment.  But he claimed that he had acted in self-defense when Owens, age 57, and Jackson, age 72, had attacked him.  While Smith sustained substantial cuts to his hand, neck, face, and side, he shot Owens twice in the head and once in the right leg.  He shot Jackson three times in the head, slit his throat, and inflicted numerous other cuts on Jackson.  Smith was also convicted of having a weapon under a disability, though that charge was tried to the bench.

{¶2}    Smith argues in nine assignments of error that the trial court erred by denying his motion to suppress statements made to police investigators, by permitting racial discrimination in jury selection, by permitting the state to adduce improper lay opinions and to impeach its own witness with her prior inconsistent statements,  and by permitting the prosecution to commit misconduct.  He further asserts that he was denied the effective assistance of counsel, that his convictions were contrary to the manifest weight of the evidence and were based upon insufficient evidence, and that the trial court erred by imposing consecutive sentences.

{¶3}    Because the trial court failed to incorporate the statutory consecutive-sentencing findings into its sentencing entry, we sustain the ninth assignment of error, in part, and remand the cause for the trial court to enter a nunc pro tunc order correcting the omission.  But we affirm the trial court's judgment in all other respects.

### I.   The Murder of Owens and Jackson

{¶4}    In the early evening of October 1, 2015, Smith left the Colerain apartment of his girlfriend, Kirby Wynn.  He traveled to the Evanston neighborhood

of Cincinnati.  He visited Jackson at his apartment located at 3306 Fairfield Avenue. Owens often shared Jackson's apartment. Later that evening, Jackson's daughter entered the apartment and found Owens' clothed, lifeless body lying on the bed.  She also found her father, dead, lying in a pool of blood halfway in a closet near the rear of the apartment.

{¶5}   When Smith returned to Wynn's apartment that evening, he was bleeding from cuts to his forehead, neck, hand, and side.  He claimed that he had been "jumped" and nearly killed.  At about the time that police responded to the Evanston crime scene, Wynn took Smith to the emergency department of Good Samaritan Hospital for treatment.   Despite his injuries, Smith twice left the emergency department.  Security supervisor Kevin Robbins spoke with Smith and ultimately persuaded him to receive treatment.  Smith's wounds were stitched and he left the hospital in the early hours of October 2.  The Cincinnati police were notified of Smith's injuries.

{¶6}   Police investigators quickly focused on Smith as the perpetrator of the double homicide.  The day after the murders they took Smith into custody, and two Cincinnati police homicide detectives questioned him about the events in Evanston the previous day.  Smith initially denied any involvement in the murders, claiming that he had been mugged downtown by unknown assailants.  He then gave multiple, conflicting explanations for what had happened in Jackson's apartment, including that Owens had entered with an unknown black male who had shot the victims. After acknowledging that he had fabricated the story of the third man, Smith admitted killing Owens and Jackson, but only in self-defense, after Owens had attacked him in the kitchen.  He claimed that he was afraid for his life, had shot Owens and then Jackson, and then had fled through the rear of the apartment.

### II. The Trial

{¶7}     The Hamilton County Grand Jury returned a multiple-count indictment against Smith charging him in separate counts with the murders of Owens and Jackson, in violation of R.C. 2903.02(A), each with accompanying firearm specifications, and one count of having a weapon under a disability. The case was tried over a period of nine days. The prosecution introduced dozens of exhibits and the testimony of 18 witnesses including that of the investigating officers, crime-scene technicians, an assistant coroner, the hospital security supervisor, and Smith's girlfriend.

{¶8}     The assistant coroner testified that the 5'1" tall Owens had been shot three times, once below the right eye, once in the right jaw, and once in the right leg below the knee. Having found stippling, or marking from gunshot residue, around the jaw wound, the coroner concluded that the shot was inflicted from two feet away or less. The coroner testified that the shot below the right eye was the fatal wound and would have rendered Owens unconscious almost immediately. The leg wound had shattered Owens' lower femur. From the geometry of the wound path, the coroner concluded that Owens had sustained the leg wound while she was standing in front of the bed, or while she was seated on it. Owens would not have been able to walk after sustaining the leg wound.

{¶9}     The coroner further testified that Jackson stood only 5'4" inches tall. He suffered from chronic lung disease, high blood pressure, and hardening of the coronary arteries. He had sustained cuts on his hands that the coroner characterized as defensive wounds caused by a sharp object. He had also sustained multiple incised wounds—cuts made by a sharp object—to his neck and head. His death was caused by bleeding from a 6½-inch incised neck wound also caused by a sharp object. The wound was so deep and long that it could only have been inflicted by an attacker's multiple strokes—perhaps a dozen or more. Jackson's left carotid arteries

and his airway were severed as a result of the neck wound. He would have quickly bled to death from that wound. But Jackson had also received three gunshot wounds to the head.

{¶10} After the prosecution had completed its case, Smith took the stand and testified in his own defense. After acknowledging that he had prior felony convictions, Smith admitted that he had lied to police detectives the day after the murders. He now described for the jury visiting Jackson to buy a drink of gin and cigarettes from the older man. As the two sat talking, Smith saw through Jackson's window that Owens and her nephew, known by the street name "Nook," were talking outside the apartment. Smith had been accosted by Nook two weeks before. Smith now observed that Nook was armed. Nook saw Smith through the window. Nook and Owens entered the apartment building and Nook motioned for Smith to come outside.

{¶11} Smith grew very apprehensive, and begged Jackson not to let Owens into the apartment. But Jackson let her in. Smith brandished the handgun that he carried. As Owens entered, she ordered Smith to leave. Smith cursed her. And, he told the jury, Owens swung at him and cut his forehead with a sharp object. She kneed him in the groin and he fell to the floor. Fearing for his life, he drew his weapon and fired at Owens as he rose from the floor. He pushed her onto the bed, and at almost the same instant, he felt a cutting wound to his neck, presumably inflicted by Jackson. He and Jackson struggled for several minutes. Smith recounted shooting Jackson, spraying Jackson with a can of bug spray, and finally disarming Jackson. As Jackson continued his attack, Smith told the jury that he had shot him again. Smith told the jury that as a black man he did not want to be found in a room with two bodies. He fled, taking his gun, a box cutter, and bug spray with him, and without summoning help for his two friends.

5

{¶12}    At Smith's request, the trial court charged the jury on the affirmative defense of self-defense, and the lesser offense of voluntary manslaughter.  The jury rejected Smith's self-defense claim and found him guilty of each murder offense and specification.  Because the jury had found Smith guilty of murder, it did not, as it had been instructed, return a verdict on the voluntary-manslaughter charge.

{¶13}    At sentencing, the trial court imposed a 15-year-to-life prison sentence for each murder offense and ordered those terms to be served consecutively to each other, to the three-year firearm specifications, and to a 36-month prison term for having a weapon under a disability.  The aggregate prison sentence was 39 years to life.  This appeal followed.

### III. Pretrial Issues

{¶14}    In his initial assignment of error, Smith contends that the trial court erred in denying his motion to suppress statements that he had made to police investigators.  Because of the serious nature of the offenses, the detectives made a visual recording of the entire interview.  The video-recorded interview with the police investigators was played for the trial court and during the jury trial.

{¶15}    Smith argues that, despite signing a waiver-of-rights form, he had not voluntarily and knowingly waived his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  He also argues that his subsequent inculpatory statements were not voluntarily made.  Smith maintains that because he was suffering from the effects of his injuries and was under the influence of prescription narcotics at the time of questioning, he could not have knowingly and voluntarily waived his *Miranda* rights or made statements to the police.

{¶16}    We review a trial court's ruling on a motion to suppress in a two-step process.  First, we must accept the trial court's findings of historical fact if they are supported by competent, credible evidence.  *See State v. Burnside*, 100 Ohio St.3d

6

152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Then this court must make an independent determination, as a matter of law, without deference to the trial court's legal conclusions, whether those facts meet the applicable constitutional standards. *Id.*

{¶17} The state bears the burden of demonstrating by a preponderance of the evidence both that Smith's waiver of rights was knowing, intelligent, and voluntary, and that his subsequent statements were voluntary. *See State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, ¶ 30; *see also State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 32; *State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 17 (1st Dist.).

{¶18} We analyze both issues using a totality-of-the circumstances test. *See State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 21. The totality of the circumstances includes the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; the existence of a police threat or inducement, and any other relevant factor. *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 9. From the evidence available, the trial court must determine the defendant's understanding, "which can be implied by his conduct and the situation." *Id.*

{¶19} At the motion-to-suppress hearing, the investigating officer, Detective Christopher Wharton of the Cincinnati police department, testified that he and another detective had interrogated Smith for about four hours on the evening after the murders. He testified that the video recording was an accurate record of the interview. Detective Wharton stated that he had advised Smith of his rights against self-incrimination, verbally and in written form, prior to questioning. Smith said, "All right," signed the waiver form, and agreed to answer the detectives' questions. Detective Wharton acknowledged that Smith had substantial injuries to his hand,

7

head, neck, and side. But the detective stated that Smith did not exhibit any side effects from any medication that he may have received. He answered questions appropriately and coherently. Smith was given snacks and a drink during the questioning.

{¶20} At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trial court to determine. *See State v. Hill*, 73 Ohio St.3d 433, 446, 653 N.E.2d 271 (1995). There was ample competent, credible evidence adduced at the hearing to support the trial court's legal decision that Smith had been properly advised of his *Miranda* rights and that he understood those rights when he signed the waiver form and answered police questions.

{¶21} Smith had executed a written waiver form. A signed waiver form is strong proof of the validity of the waiver. *See State v. Nields*, 93 Ohio St.3d 6, 19, 752 N.E.2d 859 (2001). And there was little evidence of police coercion or overreaching during the interrogation. Though the detectives had warned Smith that his girlfriend risked obstruction-of-justice charges if she lied on his behalf, a correct statement of the law about potential punishment of illegal behavior does not generally rise to the level of coercion necessary to render a confession involuntary. *See State v. W.*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 38 (2d Dist.). In light of all the other indications of voluntariness, this interrogation technique standing alone did not vitiate the interview.

{¶22} Smith was 27 years old when interviewed. He did not exhibit any behavior that would have indicated that he was under the influence of his medications. Smith responded in a logical manner to the detectives' questions. He had had extensive experience with the criminal justice system. Under the totality of the circumstances, we hold that the trial court was justified in finding that Smith had been properly advised of his rights prior to making his statements and that he had knowingly and voluntarily waived those rights.

{¶23} The state sought to discharge its second burden—demonstrating that Smith's statements were voluntarily made—by relying on the statutory presumption of voluntariness created by R.C. 2933.81(B). That statute provides that when the police make "an audio and visual recording that is an authentic, accurate, unaltered record" of an interrogation, the suspect's statements made during the interrogation are "presumed to be voluntary." *See* R.C. 2933.81(A)(3) and (B); *see also Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, 73 N.E.3d 365, at ¶ 30.

{¶24} At the hearing before the trial court, Smith added little to support his principal contention that, under the pain of his injuries and the effect of medication, his statements were not voluntary. *See* R.C. 2933.81(B). Based upon the totality of the evidence presented to support the voluntariness of his rights waiver, we hold that the trial court was also justified in finding that Smith had voluntarily made his statements to the police. The first assignment of error is overruled.

{¶25} In his second assignment of error, Smith asserts that his equal-protection rights were violated when the trial court permitted the state to exclude a potential juror based on race in violation of the rule of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

{¶26} Evaluation of a *Batson* challenge occurs in three steps: (1) the opponent of the peremptory strike must make a prima facie case of racial discrimination; (2) the state then offers a racially neutral explanation for the challenge; and (3) the trial court must decide whether the opponent has proved purposeful racial discrimination. *See State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 61. The burden of persuasion remains with the opponent of the strike. A trial court's determination that a challenge was not motivated by a discriminatory intent will not be reversed on appeal unless it is clearly erroneous. *See State v. Herring*, 94 Ohio St.3d 246, 257, 762 N.E.2d 940 (2002).

{¶27} Here, the state used a peremptory challenge to excuse an African-American prospective juror, and Smith objected on the basis of *Batson*. Although the objection took place during an unrecorded sidebar conference, the trial court recounted the gist of that conference for the record immediately after the jury was seated. The trial court determined that Smith had failed to make a prima facie case of racial discrimination. But it noted that the state had nonetheless offered a race-neutral reason for striking the prospective juror—that the prospective juror was too agreeable with Smith's theory of self-defense. Smith did not contest the trial court's description of the arguments made below.

{¶28} During voir dire, the prospective juror had stated his belief that if a person felt that his life was in danger, he was justified to take another's life. When asked if the fact that Smith had survived the altercation with Owens and Jackson rendered him more or less credible, the prospective juror responded, "He was the survivor. You do what you have to do to survive * * *."

{¶29} In light of the prospective juror's statements, we cannot say that the trial court's acceptance of the state's race-neutral explanation was clearly erroneous. *See State v. Powers*, 92 Ohio App.3d 400, 406, 635 N.E.2d 1298 (10th Dist.1993) (upholding a peremptory strike challenged under *Batson* where a juror was "very much in favor of the defense of self defense"). Smith has not met his burden to show discriminatory intent, and we overrule his second assignment of error.

### IV. Trial Challenges

{¶30} In his next three assignments of error, Smith claims that the trial court abused its discretion in various evidentiary rulings and in denying his mistrial motions. In applying this standard, a reviewing court "is not free to substitute its judgment for that of the trial judge." *Berk v. Matthews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990); *see State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972

N.E.2d 528, ¶ 14.  Rather, an abuse of that discretion is shown when the trial court's decision is unreasonable, arbitrary, or unconscionable; that is, when the trial court issues a ruling that is not supported by a "sound reasoning process." *AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶31}   Smith first argues that the trial court erred in permitting two state's witnesses to render improper opinion testimony without the state's having established a foundation for that testimony.  Evid.R. 701 limits the testimony of lay witnesses to "those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."  *See State v. Edwards*, 1st Dist. Hamilton No. C-050883, 2006-Ohio-5596, ¶ 35; *see also Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113, 539 N.E.2d 140 (1989) (trial court's decision to admit evidence under Evid.R. 701 consigned to its discretion); *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 53.

{¶32}   Smith first asserts that the trial court improperly permitted Robbins, the Good Samaritan Hospital security supervisor, to render an opinion on the severity of Smith's injuries.  Robbins testified about the appearance of Smith's injuries, and the duration of his treatment in the emergency department.

{¶33}   Immediately before Robbins had been called to testify, Smith made an oral motion in limine seeking to exclude statements by Robbins about the severity of Smith's injuries.  Smith was concerned the state would elicit an opinion from Robbins that Smith's injuries were not life-threatening.  The trial court considered the motion and acknowledged that Robbins would be able "as a lay person to [recount his observations of] any types of injuries or wounds, * * * but I won't let him get into anything to do with any type of medical diagnosis, treatment or anything of that nature."

11

{¶34}   Robbins told the jury that Smith had arrived at the hospital with cuts to his hand, forehead, and neck.  Smith had twice tried to leave the emergency department.  Both times Robbins had convinced him to return for treatment.  Smith was ambulatory, and had paused in the parking lot to light his own cigarette before returning the second time to the hospital.  Robbins testified that Smith received treatment and left the hospital after several hours.

{¶35}   Despite the concern which had prompted the motion in limine, on cross-examination, Smith's counsel asked Robbins: "Are you aware that you can be treated for serious injuries and leave on the same day?"  Robbins agreed.  On re-direct examination, and over Smith's objection, Robbins was immediately asked whether some injuries that "bleed a lot" and "that need to be stitched up" may nonetheless be superficial ones.  Robbins answered in the affirmative.

{¶36}   Here, the trial court's decision to permit Robbins to answer the re-direct question, over Smith's objection, was supported by a sound reasoning process.  Robbins was an experienced security officer and he had observed Smith closely during his stay in the emergency department.  He testified that Smith's stay was typical of someone who was treated and was then released, a conclusion well within his experience, and likely to be helpful to the jury.  *See* Evid.R. 701; *see also Urbana*, 43 Ohio St.3d at 113, 539 N.E.2d 140.

{¶37}   To the extent that Smith's cross-examination questioning had elicited the very type of opinion testimony from Robbins that Smith now alleges was error—opinion as to whether the severity of a patient's injuries could be ascertained from the time of his stay in the hospital—we agree with the trial court that Smith had opened the door to the state's inquiry on redirect examination.  The state was properly permitted to question Robbins on that issue.  *See State v. Huff*, 145 Ohio App.3d 555, 560, 763 N.E.2d 695 (1st Dist.2001).

{¶38}   Smith next argues that Dana Greely, a trace-evidence examiner for the Hamilton County Coroner's laboratory, was improperly permitted to testify that a pillowcase found in Jackson's apartment bore an impression created by Smith's right shoe.  But Smith failed to raise a timely objection to the admission of this testimony. *See* Evid.R. 103(A)(1).  Thus absent plain error arising from its admission, this issue has been forfeited.  *See* Evid.R. 103(D); *see also* Crim.R. 52(B). Plain error is an error so extreme that it affected the outcome of the proceedings and must be corrected to prevent a manifest miscarriage of justice.  *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22–23.  In light of Smith's own testimony before the jury admitting that he was in Jackson's bedroom, we cannot find that the admission of Greely's statement affected the outcome of the trial, or caused a miscarriage of justice.  *See State v. Jells*, 53 Ohio St.3d 22, 29, 559 N.E.2d 464 (1990); *see also Rogers* at ¶ 23. The third assignment of error is overruled.

{¶39}   In his fourth assignment of error, Smith contends the trial court erred by permitting the state to impeach its own witness, Kirby Wynn, in violation of Smith's right to a fair trial.  Evid.R. 607 permits a party to impeach its own witness, but only upon a showing of surprise and affirmative damage.  *See State v. Wright*, 2017-Ohio-1568, 90 N.E.3d 162, ¶ 47 (1st Dist.).  We review a trial court's application of this rule for an abuse of discretion.  *See State v. Davie*, 80 Ohio St.3d 311, 323, 686 N.E.2d 245 (1997).

{¶40}   Smith argues that, during its direct examination of Wynn, the state did not make the required showing before impeaching her with her prior statement to police, made during the investigation of the murders.  At trial, Wynn testified that after the murders Smith had come to her apartment seeking assistance.  He was agitated and bleeding from his wounds.  Wynn told the jury that Smith had explained his injuries by stating only that "I got jumped and they tried to kill me."  And he had given no further details of the incident.

{¶41} For the stated purpose of refreshing her recollection, the state then recounted to Wynn statements that she had made to police investigators on October 2, 2015, the day after the murders. Wynn had urged Smith to tell her what had happened. She told police that Smith had explained that he had been in a building in Evanston and had been with an "older man" when he was attacked. Wynn recounted to police that she had asked Smith whether that was "the older man who we always see out there."

{¶42} Despite being informed of her prior statements, Wynn denied making them and challenged the state to produce her earlier comments. She declared, "I never said no older man or no building," and inquired "don't they record us when we're in a room on a tape?" The assistant prosecuting attorney then produced a video recording of the interview that was played to Wynn, and over Smith's objection was played for the jury. After viewing the recording, Wynn recanted.

{¶43} We hold that the trial court did not abuse its discretion by allowing the state to impeach Wynn with her prior inconsistent statements. The trial court's decision that the state had made a showing of surprise or affirmative damage reflected a sound reasoning process supporting its decision. *See Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, at ¶ 14. Wynn's denials of her prior statements were hardly neutral answers such as "I don't remember." *See Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 47. She had affirmatively challenged the veracity of the assistant prosecuting attorney, and the trial court did not err in permitting the state to employ her prior statements both to refresh her recollection as well as for impeachment. *See Davie*, 80 Ohio St.3d at 323, 686 N.E.2d 245. *Compare State v. Neal*, 1st Dist. Hamilton No. C-140667, 2015-Ohio-4705, ¶ 49 (noting that the technique of permitting the jury to hear large portions of a witness's prior inconsistent statements is "more indicative of an impeachment technique than an attempt to refresh [the witness's] recollection").

{¶44} But even if the state's use of the prior testimony was inconsistent with the Evidence Rules, we could not hold that the use of Wynn's prior statements denied Smith a fair trial. From his opening statement on, Smith admitted to the jury that he had visited Owens and Jackson, "the older man," in Evanston, and that he had killed them in an altercation in their home. At worst, the use of Wynn's prior statements indicated that Smith had tried initially to hide his culpability, or that Wynn had lied to protect her boyfriend and the father of one of her children. In light of Smith's full-throated admission of involvement, we cannot say that any claimed error so affected Smith's substantial rights. *See* Evid.R. 103(A). The fourth assignment of error is overruled.

{¶45} Smith next alleges that the trial court erred in overruling his two motions for a mistrial. The first was made in response to the trial court's rulings permitting the use of Wynn's prior statements. The second was made after the state impeached Smith concerning details of his prior felony convictions.

{¶46} A mistrial must be declared only when the ends of justice so require and when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). Since the trial court is "in the best position to determine whether the situation in [the] courtroom warrant[ed] the declaration of a mistrial," the determination of whether to grant a mistrial is consigned to the discretion of the trial court. *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988); *see State v. Hamilton*, 1st Dist. Hamilton Nos. C-160247 and C-160248, 2017-Ohio-8140, ¶ 34.

{¶47} Consonant with our resolution of the fourth assignment of error, we hold that the trial court's decision overruling the mistrial motion concerning Wynn's prior statements was supported by a sound reasoning process and was not in error. In light of Smith's attempts, during his direct testimony, to minimize the number of and his culpability in his prior felony convictions, we cannot say that the state's vigorous impeachment of Smith regarding the details of his prior felony convictions

for burglary, domestic violence, and breaking and entering denied Smith a fair trial. *See* Evid.R. 609; *see also Franklin* at 127. Here, the experienced trial judge had viewed both Smith's direct testimony and the state's impeachment. The court was in the best position to determine whether a mistrial was merited, and his decision to overrule the motion did not constitute an abuse of discretion. *See Glover* at 19. The fifth assignment of error is overruled.

{¶48} Smith next argues that prosecutorial misconduct denied him a fair trial, requiring a reversal of his convictions. In support of his argument, Smith cites the cumulative effect of the state's questioning of Robbins, its impeachment of Wynn and Smith, and its improper remarks in closing argument.

{¶49} Prosecutorial misconduct will not provide a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the appellant of a fair trial. *See State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). "The touchtone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). In determining whether prosecutorial misconduct has occurred, the test is whether the prosecutor's remarks were improper, "and if so, whether they prejudicially affected the accused's substantial rights." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200; *see State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992). Applying this standard, we find no merit to Smith's claim.

{¶50} We have already held that in the first three challenged instances the trial court did not err or did not permit prejudicial error by the state. The state's comments made during the questioning of Robbins and the impeachment of Wynn and Smith were not improper and did not affect Smith's substantial rights. *See Jones* at ¶ 200.

16

Smith's remaining challenge is to remarks made by the state during closing argument. A prosecutor is entitled to a degree of latitude in closing argument "as to what the evidence has shown and what inferences can be drawn" from that evidence. *State v. Richey*, 64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992). We consider the closing argument in its entirety when determining whether it prejudiced the defendant. *Slagle* at 607.

{¶51} Here, Smith did not object to the alleged improprieties in the state's closing argument. To prevail on these claims, he must establish "both that misconduct occurred and that but for the misconduct, the outcome of the trial clearly would have been otherwise." *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.2d 1023, ¶ 109. Smith asserts that the assistant prosecuting attorney improperly commented on the evidence adduced by Smith to support his self-defense claim, and called Smith a "monster."

{¶52} The comments on the state of Smith's self-defense claim were each based on the evidence presented at trial and were within the latitude afforded in closing argument. The prosecuting attorney's characterization of Smith as a monster, while certainly intemperate, was arguably supported by the facts of the case. *See State v. Walker*, 1st Dist. Hamilton No. C-060910, 2007-Ohio-6337, ¶ 47. In any event, none of the challenged comments were so prejudicial or outcome-determinative as to constitute plain error and to deny Smith a fair trial. *See Pickens* at ¶ 109. The sixth assignment of error is overruled.

{¶53} In his seventh assignment of error, Smith contends that he was denied the effective assistance of counsel when his trial attorneys failed to object to the statements of Greely, the trace-evidence examiner, and to the challenged comments in the state's closing argument. These arguments are feckless.

{¶54} To prevail on a claim of ineffective assistance of trial counsel, Smith must show, first, that trial counsels' performance was deficient and, second, that the

deficient performance was so prejudicial that he was denied a reliable and fundamentally fair proceeding. *See Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *see also Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. A reviewing court must indulge a strong presumption that counsels' conduct fell within the wide range of reasonable professional assistance. *See State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998).

{¶55} Here, Smith's experienced trial attorneys worked to discredit the state's theory of the case and conducted a spirited defense. They vigorously argued that Smith had fought for his life defending against Owens' and Jackson's attacks. After reviewing the entire record, and in light of our resolution of the third and sixth assignments of error, we hold that counsels' efforts were not deficient, and that Smith was not prejudiced in any way. *See State v. Ridder*, 1st Dist. Hamilton No. C-150460, 2016-Ohio-5195, ¶ 20. The result of the trial was reliable and fundamentally fair. The seventh assignment of error is overruled.

### V. Sufficiency and Weight-of-the-Evidence Claims

{¶56} In his eighth assignment of error, Smith challenges the weight and sufficiency of the evidence adduced at trial to support his convictions for the murders of Owens and Jackson. Smith was convicted of two counts of murder under R.C. 2903.02(A), which proscribes "purposely caus[ing] the death of another * * *." A person acts purposely when he specifically intends to cause a certain result. *See* R.C. 2901.22(A); *see also State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 188. Smith admitted to killing Owens and Jackson, but argues that the record established that he had acted in self-defense.

{¶57} Self-defense is an affirmative defense that legally excuses admitted criminal conduct. *State v. Poole*, 33 Ohio St.2d 18, 19, 294 N.E.2d 888 (1973). A defendant is entitled to rely on the affirmative defense of self-defense when he establishes (1) that he was not at fault in creating the violent situation, (2) that he had a bona fide belief that he was in danger of imminent death or great bodily harm and that the only means of escape was by use of force, and (3) that he did not violate any duty to retreat or avoid the danger. *See State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997). "[I]n most cases, 'a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation.' " *Id.* at 326, quoting *State v. Williford*, 49 Ohio St.3d 247, 250, 551 N.E.2d 1279 (1990).

{¶58} The defendant must prove each element of self-defense by a preponderance of the evidence. *See* R.C. 2901.05(A); *see also State v. Bandy*, 1st Dist. Hamilton No. C-160402, 2017-Ohio-5593, ¶ 56. The elements of self-defense are cumulative. If a defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense. *See Williford* at 249.

{¶59} Our review of the entire record fails to persuade us that the jury, acting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the murder convictions must be reversed and a new trial ordered. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We can find no basis in this record to conclude that this is that "exceptional case" in which the jury lost its way. *See State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶60} First, the state adduced ample evidence to support the murder convictions. Smith admitted killing Owens and Jackson. From the gruesome nature of the fatal wounds that Smith inflicted on his victims and the physical evidence of struggle, the jury was entitled to conclude that Smith had purposely caused their

deaths. *See, e.g., State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 28 (intent to kill may be inferred from the manner in which the offense was committed).

{¶61} The jury was also entitled to reject Smith's self-defense claim and his explanation that he had been attacked by Owens and then Jackson. There was no evidence establishing that Smith was not at fault in creating the violent situation. According to Smith's own trial testimony, he had brought a handgun with him when he visited Jackson. After viewing Owens talking with Nook outside the apartment, he brandished the gun and readied it for action by cocking the hammer. He told the jury that he had remained in the apartment even though Owens had confronted him and ordered him to leave.

{¶62} The record also contains no evidence, save Smith's own testimony, establishing that he was in danger of imminent death or great bodily harm. A defendant's belief of imminent death or harm must be objectively reasonable. *See In re B.M.*, 1st Dist. Hamilton No. C-170103, 2018-Ohio-1733, ¶ 12; *see also State v. Oates*, 2013-Ohio-2609, 993 N.E.2d 846, ¶ 11 (3d Dist.). The substantially younger Smith employed brutal measures in response to Owens' alleged attack. No weapons were found on or near the victims' bodies. *See State v. Clark*, 1st Dist. Hamilton No. C-150318, 2016-Ohio-948, ¶ 19. And his actions were hardly similar in nature to the force he claimed that Owens or Jackson had employed.

{¶63} Finally, no evidence establishes that Smith had not violated any duty to retreat or avoid the danger. From the coroner's testimony and the other physical evidence, it is clear that Smith had reasonable means to retreat and could have ended the altercation or fled at almost any point. *See Thomas*, 77 Ohio St.3d at 326, 673 N.E.2d 1339. Owens was clearly immobilized on the bed by Smith's first gunshots. And Smith's struggle with the 72-year old Jackson afforded him several

opportunities to retreat from the confrontation rather than persist and inflict numerous, gruesome wounds on Jackson.

{¶64} As the weight to be given the evidence and the credibility of the witnesses were for the jury, sitting as the trier of fact, to determine, in resolving conflicts and limitations in the testimony, the jury could have found that Smith had purposely caused the death of Owens and Jackson and had failed to establish that he had acted in self-defense. *See* R.C. 2903.02(A); *see also State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *Thomas*, 77 Ohio St.3d at 326, 673 N.E.2d 1339.

{¶65} When reviewing the legal sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether the evidence could have convinced any rational trier of fact that the essential elements of the crime were proven beyond a reasonable doubt. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 36; *see also Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses, as both are functions reserved for the trier of fact. *See State v. Willard*, 144 Ohio App.3d 767, 777-778, 761 N.E.2d 688 (10th Dist.2001); *Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, at ¶ 37.

{¶66} Here, the record reflects substantial, credible evidence from which the triers of fact could have reasonably concluded that all elements of the charged murder offenses had been proved beyond a reasonable doubt, including that Smith had purposely caused the deaths of Owens and Jackson. *See* R.C. 2903.02(A); *see also Conway* at ¶ 36.

{¶67} Smith next argues that there may have been "sufficient" evidence to support a jury finding of voluntary manslaughter. A sufficiency claim challenges

whether a defendant was made to suffer "the onus of a criminal conviction" on less than sufficient proof. *See Jackson*, 443 U.S. at 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560. But since Smith was not "convicted" of voluntary manslaughter, his argument is inapposite and must fail.

{¶68} Finally, Smith did not argue in his appellate brief that his conviction for having a weapon under a disability was against the manifest weight or the sufficiency of the evidence. To receive consideration on appeal, trial-court errors must be argued and supported by legal authority and citation to the record. *See* App.R. 16(A). Errors not argued in a brief will be regarded as having been abandoned. *See* App.R. 12(A)(1)(b); *see also Loukinas v. Roto-Rooter Servs. Co.*, 167 Ohio App.3d 559, 2006-Ohio-3172, 855 N.E.2d 1272, ¶ 9 (1st Dist.). The eighth assignment of error is overruled.

### *VI. Sentencing Error*

{¶69} In his final assignment of error, Smith claims that the trial court failed to consider the purposes and principles of felony sentencing before imposing sentence, failed to notify him that a DNA sample would be obtained from him, and imposed consecutive sentences without journalizing its findings in the sentencing entry. We agree with the final contention.

{¶70} Smith first contends that the trial court erred as a matter of law by sentencing him without considering the purposes and principles of felony sentencing stated in R.C. 2929.11 and 2929.12. Here, it is clear from the trial court's remarks at the sentencing hearing that it considered the relevant provisions of R.C. Chapter 2929 in fashioning Smith's sentences. The trial court engaged Smith in a meaningful discussion about the seriousness of his actions and noted that he had committed these offenses while he was on community control. The court clearly articulated its reasons why the prison terms were appropriate. Thus Smith cannot demonstrate

that the trial court failed to consider the purposes and principles of sentencing. *See State v. Taylor*, 1st Dist. Hamilton No. C-150488, 2016-Ohio-4548, ¶ 3.

{¶71} Smith's next argument, that the trial court erred as a matter of law by failing to notify him at sentencing that he would be required to submit to mandatory DNA testing, is similarly without merit. Any error resulting from the trial court's failure to inform Smith about DNA testing was harmless and did not prejudice Smith. *See Taylor* at ¶ 6.

{¶72} Finally, Smith argues that the trial court failed to include its consecutive-sentencing findings in the sentencing entries. Here, the trial court made the findings to support the imposition of consecutive sentences on the record at the sentencing hearing. Those findings are amply supported in this record. *See* R.C. 2953.08(G)(2). But, as the state concedes, the court failed to make those findings a part of its sentencing entry as required by the Ohio Supreme Court's decision in *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. Thus we sustain the ninth assignment of error, in part.

{¶73} But the trial court's "failure to incorporate the statutory findings into the sentencing entry after properly making those findings at the sentencing hearing [does] not render the sentence contrary to law[.]" *Id.* at ¶ 30. Instead, "such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Id.*

### VII. Conclusion

{¶74} Therefore, we remand the cause for the trial court to enter a nunc pro tunc order correcting the omission of the consecutive-sentences findings from the sentencing entry. *See* Crim.R. 36; *see also State v. Smith*, 1st Dist. Hamilton No. C-130441, 2014-Ohio-5095, ¶ 8. But we affirm the trial court's judgment in all other respects.

Judgment affirmed and cause remanded.

**MOCK, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.