[Cite as *State v. Reid*, 2019-Ohio-1542.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170697 |
|  |  | TRIAL NO. B-1503466 |
| Plaintiff-Appellee, | : |  |
|  |  | *O P I N I O N.* |
| vs. | : |  |
| YOLANDA REID, | : |  |
| Defendant-Appellant. | : |  |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: April 26, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*William F. Oswall, Jr.*, for Defendant-Appellant.

**MYERS, Presiding Judge.**

{¶1} Defendant-appellant Yolanda Reid appeals from the trial court's judgment convicting her, following a jury trial, of murder. In three assignments of error, she argues that the prosecutor committed misconduct during closing argument; that she received ineffective assistance from her trial counsel; and that the trial court erred in instructing the jury. As Reid's second assignment of error is dispositive of this appeal, we do not address the merits of her first and third assignments of error.

{¶2} Because Reid's counsel was deficient for failing to request a jury instruction on the castle doctrine set forth in R.C. 2901.09, and because Reid suffered resulting prejudice, we reverse her conviction.

### Factual Background

{¶3} On June 27, 2015, Reid stabbed her boyfriend Melvin Hill, who died from his injuries. The grand jury returned an indictment charging Reid with murder in violation of both R.C. 2903.02(A) and (B).

{¶4} During trial, Reid argued that she had acted in self-defense. Evidence adduced at trial established that prior to the stabbing, Reid and Hill were at Reid's apartment with Hill's brother Antonio Hill ("Tony"), Hill's nephew Terry Hill ("Terry"), and Terry's wife Jacqueline Hill ("Jackie"). Tony, Terry, and Jackie testified about the stabbing and the events preceding it.

{¶5} Tony testified that Reid became violent and angry when Hill refused to help her obtain crack cocaine. He explained that Reid grabbed a butcher knife and came at Hill. Tony was able to intervene and take the knife from Reid, who then went into her bedroom. Tony heard Reid talking on the phone while he and Hill

remained in the kitchen. Reid then exited from the bedroom and stabbed Hill in the chest with a different knife. Tony testified that after stabbing Hill, Reid walked outside. Cross-examination brought out inconsistencies between Tony's trial testimony and what he told police at the scene. Questions were also raised about his memory, how much he had to drink on the day of the stabbing, and whether or not he suffered from slight dementia.

{¶6} Terry testified that in the hours before the stabbing, Reid was angry with Hill for flirting with another woman. As the two argued in Reid's apartment, Terry saw Reid grab a knife from a kitchen drawer. He explained that Tony took the knife away from Reid, who then went into her bedroom. Terry testified that Reid came back into the kitchen a short while later, stated, "I'm sick of you Melvin," and stabbed Hill in the chest. Like the others, Terry had been drinking that day. And he gave inconsistent statements as to where in the apartment he was and whether he saw the stabbing, telling the detective that he did not see the stabbing while testifying at trial that he did. He also told the detective that Reid and Hill were tussling and wrestling in the kitchen, although he denied that at trial.

{¶7} Jackie testified that prior to the stabbing, Reid was "fussing" at Hill. Jackie witnessed Reid pushing Hill, who told Reid to leave him alone. Jackie also saw Tony wrestle the butcher knife away from Reid, and she subsequently heard Reid on the telephone stating that before the night was over, she was "gonna kill that mother-fucker." Jackie testified that Reid later "zoomed" out of the bedroom and into the kitchen, where she stabbed Hill. Jackie admitted telling police that Reid was accusing Hill of putting his hands on her. And like Terry, she originally told police that she did not see the stabbing.

{¶8} The evidence established that, prior to stabbing Hill, Reid made a 911 call requesting assistance because Hill was assaulting her and would not leave her apartment. Cincinnati Police Officers Dante Daniels and Kurtis Latham testified that

3

they were dispatched to Reid's address. Both testified that the incident report for the dispatch stated, "Subject refusing to leave. Subject also has assaulted her." The report indicated that Reid made the 911 call at 10:18 p.m. But the officers were not dispatched to the scene of the call until 10:34 p.m. Officer Daniels testified that he arrived at Reid's apartment at 10:39 p.m., and that Hill had already been stabbed when he arrived.

{¶9} Reid's 911 call was entered into evidence and played for the jury. In the call, Reid requested help because Hill would not leave her apartment despite Reid's request for him to do so, and he was putting [inaudible] on her. A jury could reasonably infer she said "hands." Reid told the operator that Hill did not live in her apartment and was just a visitor. While portions of the call are unintelligible, Reid told the operator at various times that Hill was getting physical, that he had assaulted her, and that he had put his hands on her. Hill can be heard in the background stating that he, rather than Reid, had scratches and bruises on his body.

{¶10} Officers Daniels and Latham, along with Cincinnati Police Officer Chris Manson, testified that Reid returned to the apartment while they were responding to the scene, stated, "I did it," and told them to get Hill out of her apartment.

{¶11} Cincinnati Police Detective David Gregory testified that he interviewed Reid after she was taken into custody. In a video recording of the interview, which was entered into evidence and played for the jury, Reid admitted to stabbing Hill and discussed the events preceding the stabbing. Reid stated that she consumed approximately three cups of liquor throughout the evening. Reid's statements were rambling, and she did not provide a concise timeline as to the order in which the events she discussed occurred.

{¶12} Reid explained that at some point earlier in the evening, Hill had grabbed her around her neck. Reid demonstrated by making a strangling motion

around her neck. She told Hill not to put his hands on her. She also told him that he had put his hands on her for the last time. She denied being upset with Hill for flirting with another woman, and she told Detective Gregory that Hill "just [went] off again" when she refused to give Tony money to purchase crack cocaine. Reid asked Hill to leave her apartment after he called her a "bottom bitch," but he refused. He repeatedly stated, "Bitch, I ain't going nowhere," and, while seated in a chair, kicked Reid as she walked past him.

{¶13} Reid said that when she called 911 for assistance, Hill told her, "Go ahead. I'm telling them that you scratched me." Reid admitted that she probably had scratched Hill when he grabbed her neck, but it was because she "used to get abused back in the days." Some time after Reid called 911, a neighbor who heard the confrontation encouraged Reid to come outside. When Reid finished speaking with the neighbor, Hill was "still going on" and he grabbed her "like that." Reid mimicked someone strangling her neck as she said this.

{¶14} After Hill repeatedly said to her, "Bitch, what you gonna do? What you gonna do?," Hill kicked her and Reid stated that "I did went in there and I did grab the knife." She then clarified that she first grabbed a big knife, which Hill's brother took away. When this happened, Hill told her, "Bitch, you ain't going to cut me." Reid and Hill continued to argue by insulting each other's mothers, and Hill kicked her, which Reid said was "the worst thing you can do, put your feet on me. I hate for somebody to put [their] feet on me." Reid pushed him back, and stated, "That's when he got back up and leaped at me for real." Reid told Hill that he was not going to keep offending her, and she ran back into the kitchen and grabbed a smaller knife. She says she got the knife after he kicked her. She explained that she was only trying to scare Hill, but that she must have hit him with the knife. She then panicked and ran out of the door.

{¶15} During closing argument, the state argued to the jury that Reid could have left the apartment and waited for the police outside after she called 911. Defense counsel addressed this comment in her closing remarks, telling the jury that Reid had no duty to leave the apartment. Defense counsel stated:

> And you're going to get an instruction on this that says if you're faced with deadly force or you're in fear of harm, you have a duty to retreat. But guess what? The law also then expounds it and says, but if you're in your own home, you don't have a duty to retreat anymore.
>
> * * *
>
> It is not Melvin's house. Melvin can't claim that he lived there and, therefore, she doesn't have the self-defense of no duty to retreat. It's her house. She has the right.
>
> * * *
>
> So the instruction to you is she had reasonable grounds to believe and an honest belief, even if mistaken, that she was in imminent or immediate danger of death or great bodily harm, and that her only means of retreat or to escape such danger was by the use of deadly force, and that she had not violated any duty to retreat to avoid the danger. That she had not violated the duty to retreat. Guess what? You're going to get your next one. Who's got a duty to retreat? Not her. You don't have a duty to retreat in your own home. When you're in your own home, you're allowed to protect yourself.
>
> * * *
>
> It's her—we call it the "castle doctrine," is the legal term for it, because it's your castle and people can't come into your castle and harm you.

{¶16}  The jury returned a verdict acquitting Reid of murder pursuant to R.C. 2903.02(A), but finding her guilty of murder pursuant to R.C. 2903.02(B).  Reid received a sentence of 15 years' to life imprisonment.

### Ineffective Assistance

{¶17}  We consider Reid's assignments of error out of order, as her second assignment of error is dispositive of this appeal.   In her second assignment of error, Reid argues that she received ineffective assistance from her trial counsel.

{¶18}  Counsel will not be considered ineffective unless her or his performance was deficient and caused actual prejudice to the defendant.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989).  Counsel's performance will only be deemed deficient if it fell below an objective standard of reasonableness.  *Strickland* at 688; *Bradley* at 142.  A defendant is only prejudiced by counsel's performance if there is a reasonable probability that the outcome of the proceeding would have been different but for the deficient performance.  *Strickland* at 694; *Bradley* at 142.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *Id.*  A reviewing court must indulge a presumption that counsel's behavior fell within the acceptable range of reasonable professional assistance.  *Strickland* at 689; *Bradley* at 142.

{¶19}  Reid specifically contends that her counsel was ineffective for failing to request a jury instruction under R.C. 2901.09, also known as the castle doctrine.  As set forth in R.C. 2901.09(B), the castle doctrine provides that "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence."

{¶20}   Self-defense is an affirmative defense that the defendant must prove by a preponderance of the evidence. *State v. Smith*, 1st Dist. Hamilton No. C-170028, 2018-Ohio-2504, ¶ 57-58. A defendant is entitled to rely on the affirmative defense of self-defense when she or he establishes "(1) that he was not at fault in creating the violent situation, (2) that he had a bona fide belief that he was in danger of imminent death or great bodily harm and that the only means of escape was by use of force, and (3) that he did not violate any duty to retreat or avoid the danger." *Id.* at ¶ 57. The castle doctrine concerns the third element of self-defense, as it recognizes an exception to the duty-to-retreat requirement when a defendant is in her own home. *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239,¶ 6.

{¶21} Ohio law also separately provides for a presumption of self-defense when someone uses deadly force against a person that has unlawfully and without privilege entered the residence occupied by the person using the defensive force. Former R.C. 2901.05(B)(1);[1] *State v. Hilliard*, 1st Dist. Hamilton No. C-160263, 2017-Ohio-2952, ¶ 4. But that presumption does not apply when the "person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence." Former R.C. 2901.05(B)(2)(a); *Hilliard* at ¶ 4. The presumption of self-defense may be rebutted by the state. Former R.C. 2901.05(B)(3). To rebut the presumption, the state must establish by a preponderance of the evidence that "the defendant's conduct in the affray did not meet the elements of self-defense." *State v. Kean*, 10th Dist. Franklin No. 17AP-427, 2019-Ohio-1171, ¶ 48, quoting *State v. Nye*, 3d Dist. Seneca No. 13-13-05, 2013-Ohio-3783, ¶ 30. Here, the third element of self-

---

[1] R.C. 2901.05 was revised while this action was pending. We apply the version of the statute in effect at the time that the offense was committed. *State v. Dukes*, 4th Dist. Scioto Nos. 16CA3745 and 16CA3760, 2017-Ohio-7204, ¶ 60, fn. 3.

defense, that Reid had not violated a duty to retreat, could not have been rebutted because Reid had no duty to retreat.

{¶22} "[A] criminal defendant has a right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990). Here, the evidence established that the confrontation between Reid and Hill took place inside Reid's apartment. Consequently, Reid had no duty to retreat. *See id.* at 250. The evidence in this case warranted a castle-doctrine instruction.

{¶23} The trial court properly instructed the jury on the elements of self-defense and that Reid had the burden to prove those elements. It then instructed the jury regarding Reid's duty to retreat by providing the following instruction:

DUTY TO RETREAT. The defendant had a duty to retreat if she was at fault in creating the situation giving rise to the stabbing of Melvin Douglas Hill or did not have reasonable grounds to believe and an honest belief that she was in imminent or immediate danger of death or great bodily harm or that she had a reasonable means of escape from that danger other than by the use of deadly force.

The defendant no longer had a duty to retreat if: (1) she retreated, escaped or withdrew from the situation or reasonably indicated her intention to retreat or escape from the situation and no longer participate in it and (2) she then had reasonable grounds to believe and an honest belief that she was in imminent or immediate danger of death or great bodily harm; and (3) the only reasonable means of escape from that danger was by the use of deadly force, even though she was mistaken as to the existence of that danger.

9

{¶24} The trial court additionally instructed the jury on the rebuttable presumption of self-defense as set forth in former R.C. 2901.05. The jury was instructed that:

> DEFENSE OF RESIDENCE. A person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence occupied by the person using the defensive force.
>
> The presumption set forth above does not apply if the person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence.
>
> The presumption set forth above also does not apply if the person who uses the defensive force uses it while in a residence and the person is unlawfully, and without privilege to be, in that residence.
>
> This presumption is a rebuttable presumption and may be rebutted by the state by a preponderance of the evidence.

{¶25} The trial court's instructions failed to inform the jury that a person lawfully in their own home has no duty to retreat before using force in self-defense.

{¶26} Here, if the jury had found that Reid proved the first two elements of self-defense by a preponderance of the evidence (either because of the rebuttable presumption or otherwise if the jury found the presumption inapplicable), it would then have had to consider whether Reid violated any duty to retreat before using force in self-defense. The jury instructions provided by the trial court identified a single instance in which Reid would not have had a duty to retreat: where, after retreating or withdrawing from the situation, Reid had reasonable grounds to believe

10

she was in imminent danger of death or great bodily harm and the only means of escape was by the use of deadly force. *See State v. Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 20. But because the confrontation took place in her home, Reid actually had no duty to retreat, regardless of whether the circumstances just described had occurred. The omission of an instruction on the castle doctrine failed to inform the jury of this.

{¶27} The instruction on the rebuttable presumption of self-defense, set forth in former R.C. 2901.05, did not serve as a replacement for an instruction on the castle doctrine. "The difference between the Castle Doctrine and the rebuttable presumption of self-defense lies in the legal status of the victim." *State v. Lewis*, 2012-Ohio-3684, 976 N.E.2d 258, ¶ 18 (8th Dist.). Under the rebuttable presumption of self-defense, if the jury had found that Hill was unlawfully and without privilege in Reid's apartment, then Reid would have been entitled to a presumption that she acted in self-defense. The jury would then have had to determine whether the state presented sufficient evidence to rebut that presumption by a preponderance of the evidence. However, the duty to retreat element could not be rebutted. But if the jury had found that Hill was lawfully in Reid's apartment, although not entitled to a presumption that she acted in self-defense, Reid still had the opportunity to prove self-defense. As to the third element, in the absence of a castle-doctrine instruction, the jury would not understand that Reid had no duty to retreat before using force in self-defense in her own home. *See Lewis* at ¶ 19.

{¶28} We therefore find that counsel was deficient for failing to request that the trial court provide an instruction on the castle doctrine. This is particularly true when considering counsel's repeated statements to the jury during closing argument that Reid had no duty to retreat and that the trial court would instruct it accordingly.

{¶29} We now consider whether Reid was prejudiced by counsel's deficient performance. While Reid did not testify, the jury was presented, through the

introduction of Reid's 911 call and her interview with Detective Gregory, with evidence on the remaining elements of self-defense, specifically whether Reid was at fault in creating the situation and whether she had a bona fide belief that she was in danger of imminent death or great bodily harm.

{¶30} In the 911 call, Reid told the operator that Hill had put his hands on her and assaulted her. And Reid stated in her interview with Detective Gregory that Hill had repeatedly verbally attacked her and had kicked her after he "went off" when she refused to give his brother money to purchase crack cocaine. She stated that Hill had grabbed her neck, and she mimicked someone strangling her neck. Reid told Hill not to put his hands on her and that he had done so for the last time. She described in detail the back-and-forth confrontation between herself and Hill that led to the stabbing. She explained that after Hill had kicked her and then leaped at her when she pushed him back, she got a knife.

{¶31} The confrontation took place in Reid's small apartment, where she was surrounded by Hill and three of his family members. The record established that Hill was a large man, weighing approximately 220 pounds. While Reid did not specifically say she believed she was in danger of imminent death or great bodily harm, based on Reid's description of the ongoing confrontation between herself and Hill, we find that the jury could reasonably have found that Reid had such a reasonable belief and that Reid was not at fault in creating the situation. The jury would then have had to determine whether Reid violated any duty to retreat, an issue on which it had not been properly instructed.

{¶32} On this record, there is a reasonable probability that the outcome of the proceedings would have been different had counsel requested a castle-doctrine instruction. This is particularly true where counsel repeatedly told the jury during closing argument that Reid had no duty to retreat and that it would receive a castle-doctrine instruction explaining that a defendant has no duty to retreat when faced

with deadly force in the defendant's own home.  The problem was compounded by the prosecutor's incorrect statement of the duty to retreat.  During closing, the prosecution reiterated that Reid had a duty to retreat and referred the jury to the court's incorrect instruction on this issue.  In the absence of the castle-doctrine instruction, which counsel had stated would be given, the jury reasonably would have believed that Reid in fact did have a duty to retreat.

{¶33}  Consequently, we find that Reid was prejudiced by counsel's deficient performance.

{¶34}  Reid's second assignment of error is sustained.  Our resolution of this assignment of error renders moot Reid's remaining assignments of error.

### *Conclusion*

{¶35}  The trial court's judgment is reversed, and this cause is remanded for proceedings consistent with the law and this opinion.

Judgment reversed and cause remanded.

CROUSE, J., concurs.
WINKLER, J., dissents.

WINKLER, J., dissenting.

{¶36} I respectfully dissent.  While I agree that counsel should have requested a jury instruction on the castle doctrine, I disagree with the majority's conclusion that Reid was prejudiced by trial counsel's failure to request said instruction.  When considering the prejudice prong of an ineffective-assistance-of-counsel claim, the conviction should be reversed only if there is a reasonable probability that, but for counsel's errors, the outcome of the trial would have been different.  *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373.  A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Strickland* at 694.  "The

assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695.

{¶37} Upon my review of the record, I have confidence in the jury's finding of guilt on the charge of felony murder. The state's evidence demonstrated that Reid acted out of anger toward Hill and not out of fear that Hill was going to cause her death or inflict great bodily harm. Because there is no reasonable probability of a result more favorable to Reid, Reid was not prejudiced by counsel's error.

{¶38} The elements of self-defense are cumulative. *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986). If the jury found that Reid was at fault or she lacked reasonable grounds to believe and an honest belief that she was in imminent or immediate danger of death or great bodily harm, then she could not rely on self-defense, and the jury would not reach the duty-to-retreat issue that was implicated by counsel's error.

{¶39} Assuming that Reid was entitled to the presumption, afforded under R.C. 2901.05, that she had acted in self-defense, the state rebutted the presumption by producing, in my opinion, conclusive evidence that Reid did not have an honest and reasonable belief that she was in imminent danger of death or great bodily harm. Therefore, given the cumulative nature of the elements of self-defense, the jurors simply would have never considered the duty to retreat, or in the case of Reid, that she had no duty to retreat. Because Reid's acts were not reasonable under the circumstance existing at the time of the stabbing, the duty to retreat is immaterial to the jurors' analysis of Reid's claim of self-defense.

{¶40} In the court's instruction on the elements of self-defense, it provided the jurors with the test for whether Reid's actions met the test for reasonableness:

TEST FOR REASONABLENESS

14

Words alone do not justify the use of deadly force. Resort to such force is not justified by abusive language, verbal threats, or other words, no matter how provocative.

In deciding whether Yolanda Reid had reasonable grounds to believe and an honest belief that she was in imminent or immediate danger of death or great bodily harm, you must put yourself in the position of the defendant, with her characteristics, her knowledge or lack of knowledge, under the circumstances and conditions that surrounded him [sic] at the time. You must consider the conduct of Melvin Douglas Hill and decide whether his acts and words caused Yolanda Reid reasonably and honestly to believe that she was about to be killed or receive great bodily harm.

If she used more force than reasonably necessary and the force used is greatly disproportionate to the apparent danger, then the defense of self defense is not available.

{¶41} Admittedly, Terry's, Tony's, and Jackie's testimony was not overly persuasive. Nevertheless, it provided a common thread woven through the night's events leading to Hill's stabbing and ultimate death. The credibility of the state's witnesses is the province of the jurors. The jurors were free to believe some, all or none of those witnesses' testimony. Moreover, the state presented additional evidence corroborating their testimony that Reid had not been in any real danger when she stabbed Hill, by relying upon Reid's own words in her 911 call and her interview with Detective Gregory.

{¶42} During the 911 call, Reid told the operator she had been "assaulted" and "hit" by Hill and requested assistance from the police in removing Hill from her apartment. But Reid could not identify any injury and declined the offer of an ambulance. Hill can be heard in the background during the call inviting the police to

come because Reid had been assaulting him. Both Reid and Hill sound agitated during the call, but their tones lacked urgency. Reid repeatedly stated that "he had put his hands on her" and she "was not going for that," and she "just wanted" Hill "out of her house." Before Reid's call ended, 14 minutes before the stabbing, the operator informed her that officers would respond to her location.

{¶43} Reid's interview with the police occurred about five hours after the stabbing. Although the police repeatedly gave her the opportunity to say that she had feared Hill was going to seriously or fatally harm her, she did not. Instead, she described a scene in her apartment on the evening of the stabbing, apparently not unusual in their 20-year relationship, where they were argumentative and physical, but not characterized by a serious threat to her life. Reid, who had to awaken early the next morning for work, wanted Hill to leave her apartment. During her rambling recollection of the evening, she conveyed to the police that Hill had repeatedly "put his hands" on her and had insulted her. She made a gesture several times indicating that Hill had put one hand on her neck or her face, but the gesture did not mimic a two-handed chokehold as in a strangling, and she never said that Hill had attempted to choke or strangle her. She did say that the touching had put pressure on an aching tooth, and that Hill had apologized for hurting her in that way.

{¶44} When recalling the events specifically leading up to the stabbing, Reid said that she had first grabbed a large knife to address Hill's insults, physical contact, including kicking her from a seated position, and his refusal to leave, but that Tony had taken that large knife away from her. When Hill taunted and continued to goad and disrespect her, she left Hill, ran to the kitchen to grab another knife, and thrust it toward him to "scare" him. The fact that she had actually cut him had surprised her. Reid's statements, when considered in the context of Reid and Hill's relationship, and the photographs taken of Reid after her interview showing no sign of physical

injury, do not support an inference that Reid had both an actual and reasonable belief that she was in imminent danger of death or great bodily harm.

{¶45} Importantly, Reid left Hill to retrieve the second knife, and when she returned, she did not use that knife in response to any physical force or threat from Hill. The castle doctrine does not justify Reid's use of deadly force under these circumstances, even if one assumes Reid had no duty to retreat from her apartment.

{¶46} Because of the strength of the state's evidence, there is no reasonable probability that Reid would have obtained a more favorable result absent counsel's deficient performance, as her conviction was not affected by the lack of proper instruction on the castle doctrine. Further, I have reviewed the remainder of Reid's arguments and conclude they are meritless. Consequently, I would overrule Reid's assignments of error and affirm the trial court's judgment.

Please note:

The court has recorded its own entry on the date of the release of this opinion.