[Cite as *State v. Coates*, 2025-Ohio-5340.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                      No. 114534

    v.                           :

DENNIS COATES II,                       :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 26, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-687701-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory M. Paul and Connor Davin, Assistant Prosecuting Attorneys, *for appellee.*

Marein & Bradley, John T. Martin and Steven L. Bradley, *for appellant.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Dennis Coates, II ("Coates") appeals his convictions for the murder of DiMesha Wright ("Wright"), the attempted murder of T.W. and Deasia Williams

("Williams") and other associated offenses, including felonious assault, all with firearm specifications.  For the following reasons, we affirm Coates' convictions.

## I.    Facts and Procedural History

{¶ 2} On December 14, 2023, Coates was living in a house on Harland Avenue in Cleveland, Ohio (the "Harland Avenue house").  At 3:20 a.m., while he was inside the Harland Avenue house, Coates fired 14 shots from a Bushmaster assault rifle through the front door after hearing the doorbell camera ping and "picking" at the knob of the front door.  Coates' shots killed Wright, who had been living in the Harland Avenue house with him and was attempting to enter through the front door. T.W., Wright's infant child, was in her arms at the time of the shooting and police later found the child crawling on the ground, uninjured.  Coates' shots also hit and injured Williams, who had driven Wright to the house and was in her car parked in front of the Harland Avenue house at the time Coates fired the assault rifle.

{¶ 3} Coates was charged with 15 felony counts for the murder and attempted murders of the three victims.  Coates filed a notice of intent to argue self-defense pursuant to Crim.R. 12.2.  The court held a hearing on the State's motion in limine to limit the testimony of Coates' expert witness Dr. Charles Heller ("Dr. Heller").  The court granted, in part, the State's motion, ruling that "the expert is limited in his testimony and is precluded from testifying as to [Coates'] state of mind in support of his self-defense claim.  The expert may testify as to [Coates'] diagnosis" of post-traumatic stress disorder.

{¶ 4} A jury trial commenced and the court dismissed six of the counts prior to the jury deliberations. The jury found Coates not guilty of aggravated murder and attempted aggravated murder and guilty of the remaining counts: two counts of murder and two counts of felonious assault regarding Wright; attempted murder regarding T.W. and attempted murder and felonious assault regarding Williams. All counts of which Coates was convicted carried one- and three-year firearm specifications.

{¶ 5} The court sentenced Coates to life in prison with parole eligibility after serving 28 years.

{¶ 6} Coates appeals raising the following assignments of error for our review:

> I.     The trial court erred in not allowing the jury to consider the Castle Doctrine and the specific presumption that Mr. Coates enjoyed if he believed his home was being invaded by an intruder.
>
> II.    The trial court erred when it failed to instruct the jury in Counts Two through Five on the lesser-included offense instructions premised upon a reckless men rea, as requested by the defense.
>
> III.   The trial court erred when it prevented the defense from presenting expert testimony about how Mr. Coates' PTSD could affect a person confronted with the circumstances that Mr. Coates [was] confronted [with] at the time of the alleged offenses.
>
> IV.    The trial court erred in instructing the jury that, even when deadly force is otherwise justified, it must still not be unreasonable.

## II. Trial Testimony

### A. State's Witnesses

#### 1. Deasia Williams

{¶ 7} Williams testified that on the night of December 13, 2023, she was driving some friends around, including Wright. After the bars closed at 2:00 a.m., Williams dropped Wright and her seven-month-old son off at their home, the Harland Avenue house. Williams pulled in front of the house and Wright, who was holding her son, got out of the vehicle. According to Williams, Wright was going to take two trips from Williams' car to bring her personal belongings to the house. Williams testified as follows about what happened next:

> She got out, she was going to the door. Said she'd be right back. She walks up the walkway. I watch her walk up the walkway. As soon as she open the door, I look down to put my address in my phone to go home. And, like, as soon as I look down, like, bullets start coming through my car. And then I duck down and I started pulling off.

{¶ 8} Williams testified that she drove herself to the hospital because she believed she had been shot. According to Williams, her leg was burning and her eye and hand were bleeding. Williams further testified that, at the time of the shooting, she had never met, nor did she know, Coates.

#### 2. Kortez Johnson

{¶ 9} Cleveland Police Officer Kortez Johnson testified that he is a Cleveland police officer and he was working the night of December 13, 2023, into the early morning hours of December 14, 2023. Off. Johnson and his partner received a call for "shots fired" at 3:22 a.m. at the Harland Avenue house. As they arrived at the

house, Off. Johnson saw "a female like on the ground and a baby crawling around her crying. Seemed to be in distress." The female was not breathing and had no pulse. Upon assessment of the body, Off. Johnson saw gunshot wounds on the female's back. Off. Johnson and his partner did not initially know from where the shots came.

{¶ 10} The police attempted to administer first aid to the victim. Off. Johnson testified that a wallet with a key attached to it was found at the scene. The wallet and key belonged to Wright and were used to help identify her as the victim. At this time, the police did not know that the shooter was still inside the house. The shooter, later identified as Coates, eventually came out of the house, although Off. Johnson did not have any personal interaction with him.

### 3. Matthew Cavanaugh

{¶ 11} Cleveland Police Department Crime Scene Unit Detective Matthew Cavanaugh testified that, in the early morning hours of December 14, 2023, he was called to a homicide crime scene on Harland Avenue in Cleveland. Wright was found on the ground at the bottom of the front steps.

{¶ 12} Det. Cavanaugh testified that there was a camera doorbell to the right of the front door of this house and the monitor that displayed the video from that camera was inside the house on the wall "[a]pproximately 10 to 15 feet" from the front door. According to Det. Cavanaugh, a rifle was found "right by the front door" and a Glock pistol with an extended magazine and a "switch" that turns "it from a semiautomatic firearm to a full auto firearm" was found on the couch. 14 fired

cartridge casings and live ammunition in extra magazines and boxes were recovered from the front hallway and living room area and bullet defects were found in the front storm door, entry door and doorframe.

{¶ 13} Det. Cavanaugh further testified that "baby" items, such as a play crate, a black diaper bag and a box of Pamper diapers were found in the house.

### 4. Rose Schardt

{¶ 14} Cleveland Emergency Medical Service paramedic Rose Schardt testified that someone placed a 911 call concerning "a potential gunshot victim" at 3:36 a.m. on December 14, 2023. Schardt and her partner arrived at the scene at 3:47 a.m. to find Wright "supine on the ground . . . pulseless" with "no heartbeat . . . and she's not breathing at all," and "a small child on scene, crying, crawling around . . . at her side . . . ." According to Schardt, Wright had "significant" gunshot wounds "to her upper back . . . ." Schardt testified that Wright "had no obvious injuries to the front of her" body.

### 5. Nautia Minnifield

{¶ 15} Nautia Minnifield testified that she is Wright's cousin and "best friend." According to Minnifield, the Harland Avenue house was Wright's "home" and Wright had been living there "[a]bout five months, four months" prior to her death. Wright moved into the house with her child in August 2023. Prior to that time, Wright's boyfriend Willie Hicks lived in the house.

{¶ 16} In October 2023, Coates moved into the house. According to Minnifield, Wright expressed to her that she was "dissatisfied living in that home

with . . . Coates." Specifically, Wright complained to Minnifield that Coates "made her feel uncomfortable."

{¶ 17} Minnifield and Wright attended dental assistant school together every Monday, Wednesday and Friday starting in October 2023. Minnifield would pick Wright up and they would drive to school together. Minnifield testified that she "rarely" picked Wright up from the Harland Avenue house after Coates moved in because he made her feel uncomfortable although Wright still had "belongings" in the house. Minnifield testified that Wright would stay at the house "sometimes" and otherwise would stay at her father's house, which was close to the dental school. Asked if she knew Wright "to continue to live in that Harland Avenue address," Minnifield answered, "Yes."

{¶ 18} According to Minnifield, Wright had planned to move out of the house with her child in December 2023.

{¶ 19} Minnifield, Wright, Williams and another friend went out to celebrate Wright's and Minnifield's graduation from dental school on December 13, 2023, sometime around "11:30, 12-ish." Minnifield's father watched Wright's child while the four friends were out. Williams was driving that night and the group went to two bars. They stayed at the second bar until it closed at 2:00 a.m. and then went to Minnifield's father's house and then to Minnifield's grandmother's house. Minnifield testified that, after this, Williams dropped Wright off at the Harland Avenue house.

{¶ 20} Minnifield received a FaceTime call from Williams shortly after they parted ways and Williams showed Minnifield the bullet holes in her car. Minnifield was concerned about Wright and called her. When Wright did not answer her phone, Minnifield called the police.

### 6. David Dolinak, M.D.

{¶ 21} Dr. David Dolinak testified that he is a deputy medical examiner with the Cuyahoga County Medical Examiner's Department. Dr. Dolinak testified that he performed the autopsy on Wright's body. According to Dr. Dolinak, Wright's cause of death was gunshot wounds, and the manner of death was homicide. Specifically, Dr. Dolinak testified that Wright had two gunshot wounds in her right shoulder, two gunshot wounds to her back, which injured her heart, aorta, vertebra and spinal cord, one gunshot wound to her right arm and several "superficial fragmentary projectile injuries" from pieces of bullets that struck her skin. According to Dr. Dolinak, the two bullets that struck Wright's shoulder also entered her body from the back. Dr. Dolinak testified that one of the bullets that entered through Wright's back and hit her aorta and spine was the "most immediate" cause of death.

### 7. Richard Tusing

{¶ 22} Richard Tusing testified that he is a homicide detective with the Cleveland Police Department. Det. Tusing testified that he received a message to respond to the Harland Avenue house "for a female that was pronounced deceased on scene." Det. Tusing arrived at the scene at 5:00 a.m. on December 14, 2023. By this time, Wright had been pronounced dead, the seven-month-old baby that was

found crawling on the ground was taken to the hospital, although there were no apparent injuries to him, and "there was a male that was inside of the house, who eventually came out and turned himself over" to the police on scene. Additionally, there was another victim, later determined to be Williams, who was at the Cleveland Clinic and reported that "she was shot at and hit with shrapnel and/or glass when she was shot at."

{¶ 23} Det. Tusing learned there was "an empty box of ammunition lying on the front tree lawn, and there was a knife that was laying near the driveway in the yard." Additionally, "there were shell casings throughout the living room, hallway, right off of the living room and into the bathroom" of the Harland Avenue house.

{¶ 24} Det. Tusing testified as follows about the camera doorbell system at the Harland Avenue house: "When somebody entered the yard threshold you would hear a ding from the wall mounted unit, like a little buzz or something, that would activate the wall mounted unit. Then you look at the wall mounted unit you could see a display of what activated that . . . camera." According to Det. Tusing, the wall mounted unit played the video "in real time."

{¶ 25} Det. Tusing testified about the video from the doorbell camera at 3:20 a.m. that morning, which showed Wright walk up to the front door of the Harland Avenue house. Approximately 15 seconds into the video, Wright is shot multiple times through the front door. More specifically, Det. Tusing testified that six seconds passed between the time Wright opened the screen door and the time she was shot.

{¶ 26} According to Det. Tusing, a neighbor across the street first called 911 at 3:22:09 a.m.

{¶ 27} Det. Tusing testified that Coates was taken from the Harland Avenue house to the police station where he was interviewed. Coates was the only person inside the house at the time of the shooting. Det. Tusing testified that Coates told the police "several times in his interview" that he fired "warning shots" after hearing "picking at the door" from his doorbell camera.

{¶ 28} Det. Tusing testified that two cell phones were found on or near Wright's body at the scene, one with the last four digits of 0826 and one with the last four digits of 0790. Additionally, the police recovered two cell phones from Coates, one with the last four digits of 4311 and one with the last four digits of 4007. The phone with the last four digits of 4007 was registered to Willie Hicks, but it was in Coates' hand as he exited the Harland Avenue house on the morning of December 14, 2023.

{¶ 29} Between 6:40 p.m. and 7:40 p.m. on December 13, 2023, someone conducted several internet searches on the 4311 phone for "Is a codefendant a snitch," "Codefendant meaning," "What felony is a burglary" and "How long could you do if you murder someone and turn yourself in."

{¶ 30} Between 1:35 a.m. and 1:36 a.m. on December 14, 2023, someone conducted several internet searches on the 4311 phone for "Are you allowed to shoot someone who's trying to break into your house" and "Are you allowed to shoot someone on your property."

{¶ 31} At 3:23 a.m. on December 14, 2023, someone placed a call from the 4311 phone to a contact named "Auntie Twa." A FaceTime call was placed from the same phone to "Auntie Twa" at 3:24 a.m. At 3:25 a.m., two calls were made from this phone to "Auntie Twa 2" and, at 3:26 a.m., a FaceTime call was made to "Auntie Twa 2." At 3:28 a.m., another call was made from Coates' phone to "Auntie Twa 2."

{¶ 32} According to Det. Tusing, a call was made from the 4007 phone to 911 at 3:36 a.m.

{¶ 33} Det. Tusing testified about a printout of text messages exchanged between Coates' phone ending in 4311 and Wright's phone ending in 0826 between October 13, 2023 and December 12, 2023. These text messages reveal that on October 13, 2023, Coates had the locks to the Harland Avenue house changed and procured a new key for Wright. On October 23, 2023, Coates had to let Wright in the house because she forgot her key. On November 8, 2023, Wright texted Coates that she left her key inside the house. Wright forgot her key again on November 10, 2023 and texted Coates to let her in the house. On November 17, 2023, Coates texted Wright asking if she found "that other key." Wright replied that it was on the kitchen counter. On November 24, 2023, Coates texted Wright asking, "You was home last night?" to which Wright replied, "Yeah."

{¶ 34} On November 25, 2023, Coates texted Wright saying that he left his key in the house. Wright replied with a time frame for when she would be home. On November 26, 2023, Coates texted Wright saying, "Open door if you woke." Wright replied by texting, "Damn you was lock . . . [o]ut." On December 3, 2023,

Coates texted Wright, "You never found that other key." Wright replied, "No." On December 7 and 8, 2023, the two texted about Wright leaving the baby monitor on at the Harland Avenue house and asking if a package had been delivered.

{¶ 35} On December 12, 2023, which is the last day of the text message exchange and less than two days before Wright was killed, the following texts, which are copied verbatim, were sent and received between 8:59 a.m. and 4:44 p.m.:

> COATES:    When you leaving I'm finna get the locks changed you on some weird s***
>
> WRIGHT:    Since when you start calling shots don't make me get the police involved my shit in there I been there longer den 6 months at the end of the day I was there before you came back day for day I don't have to sit in that house with you N**** thats uncomfortable asf you wanna be all I my business N**** I been staying out because I have school I'm almost done so I try to stay on this side whats weird s*** ???
>
> WRIGHT:    N****s ain't playing no rent in that b****
>
> WRIGHT:    That's Willie house
>
> COATES:    This our s*** until one of us move out or get bigger ideas we moved in this b**** together f*** you talm bout First you try to put me on w them weak a** hoes,den you try to record me now you barely here but fake stay here you don't gotta be here at all rir
>
> COATES:    I apologize you got mail tho
>
> WRIGHT:    Liked "I apologize you got mail tho"

{¶ 36} Det. Tusing testified that Coates moved into the Harland Avenue house on October 7, 2023. Det. Tusing further testified that Wright and her child had a separate room in the Harland Avenue house because one of the bedrooms had "all of the baby items in it."

{¶ 37} Under cross-examination, Det. Tusing testified that Coates' cell phone records show he was on a FaceTime call with his girlfriend Mariana on December 14, 2023, from 12:10 a.m. until 3:23 a.m., which is three minutes after the shooting. To be clear, Coates and his girlfriend were on a FaceTime call, "or at least had an open line . . . for three plus hours, that included the time of the shooting . . . ."

### B. Defense's Witnesses

### 1. Twalann Coates

{¶ 38} Twalann Coates ("Twalann") testified that Coates is her nephew. Twalann testified that Coates is close with her son Willie, who is Coates' cousin. Willie, Coates and someone named Jermaine lived in the Harland Avenue house. In August 2023, Wright, who had been dating Willie "on and off since they was about 12," moved in. Twalann testified that she knew this because she gave Wright the keys to the Harland Avenue house.

{¶ 39} According to Twalann, in May 2023, Coates was "in possession" of Willie's car when the "front windshield was shot, a back side window, and multiple bullets around the vehicle, bullet holes around the vehicle." Twalann testified that Coates "was over by the women prison, on 77 South traveling, and somebody just shot up the car just on the road." According to Twalann, Coates "was so scared to the point where he stopped coming around. He took a break from being around us and my boys. He didn't know where it came from — I mean, he was — we hadn't heard from him until he probably ended up moving back into the house on Harland."

{¶ 40} Twalann testified that Coates called her in the "early morning hours" of December 14, 2023, "screaming and yelling" that "somebody just trying to break in." Twalann testified that she told Coates to call the police. Twalann got dressed and drove to the Harland Avenue house. By this time, it was "[a]bout 3:30 in the morning." Twalann testified that she needed "to call and check where [Wright] is" because she "hadn't been there and she had lost her key." Twalann further testified that the Harland Avenue house was her house.

{¶ 41} Under cross-examination, Twalann testified that Coates was living in the Harland Avenue house prior to October 2023 but that he had moved out and then moved back in October 2023. Wright lived in the house "alone" from August until October 2023. According to Twalann, nobody asked Wright if it was okay if Coates moved back in because it "was already [Coates'] house." Twalann further testified that the Harland Avenue house is Coates' house. "The bills was in his name."

{¶ 42} According to Twalann, she told the police that when Coates called her to tell her someone was trying to break into his house, she told him, "Hold on, it might be" Wright "because she lost her key." However, Coates had already fired the gun when he called her. The following colloquy ensued:

Q: Would it surprise you to learn that [Wright] had a key in her hand to that house and was entering that door?

A: Whose [sic] to say that the key went to the house?

Q: Do you know?

A: Don't nobody know.

Q:     You don't know though, do you?

A:     Don't nobody know.

### 2. Shanoya Johnson

{¶ 43} Shanoya Johnson ("Johnson") testified that Coates is her son. According to Johnson, she, her husband and her children, including Coates, moved from Cleveland to Garfield to Euclid to Richmond Heights because each neighborhood was "[j]ust not safe" anymore and there was "just violence, too much." In 2018, the family was living in Richmond Heights. At the time, Coates was attending John Hay High School and the commute each way was "maybe an hour and a half, maybe two" and it involved "two bus rides and a train."

{¶ 44} Johnson testified that, on November 13, 2018, she did not want Coates to take the bus to school because "just things that you hear on the news, that you see, you know, people robbing and taking things from people on the bus." Coates took the bus that day and he was robbed. Johnson took Coates to the police station to make a report. According to Johnson, Coates "was anxious, he appeared scared." Johnson testified that Coates changed after this. "He just needed to know where everybody was at, like, anytime. He'd call my phone all day. If it was too long where he don't hear from me he'll panic. 'Where you at? What you doing.' Just anxious of anything we do. Like if we're not home it's like where's — worried about, like I need to know where you're at, like all times."

{¶ 45} Coates did not go back to John Hay High School after the robbery. Rather, he attended school in Richmond Heights, where he lived. In November

2019, Johnson considered sending Coates to therapy after he began yelling at "some guys" who were "trying to cross the street . . . ." According to Johnson, Coates "was, like, frightened, like scared, like get me away from here." Johnson further testified that Coates' brother and stepdad had also been robbed, which made Coates "[m]ad, anxious and sad, afraid."

{¶ 46} Johnson testified in more detail about how Coates' behavior changed: "He — he had started talking about, like Satan, a house of energies, he started doing crystals, and inner peace and things he was trying to do to keep himself calm around the house."

{¶ 47} According to Johnson, Coates FaceTimed her in May 2023 after someone shot at the car he was driving. Johnson could see via the FaceTime video "a car with a humongous hole in the front of the windshield on the driver's side and down the side of the car there were multiple shots, bullet holes." Coates became "antsy, so anxious [he] can't sit down, any noise he's back and forth to doors, windows. Not sleeping. Everything just made him just nervous. Just — it was no calm. Kind of like it's always something happening."

{¶ 48} Under cross-examination, Johnson testified that she had conversations with Coates about him going into therapy or getting medical treatment, but "he just wasn't willing."

{¶ 49} Johnson confirmed that Coates went to live at the Harland Avenue house "again" in October 2023. Johnson testified that, when she learned Wright and her infant son were living in the Harland Avenue house with Coates, she did not

tell Wright "about these things going on in" Coates' life. Johnson further testified that Coates told her when he purchased the assault rifle, but Johnson did not say anything to anyone about this.

### 3. Dennis Coates, II

{¶ 50} Coates testified that he "heard and saw . . . acts of violence" while growing up in various neighborhoods. Coates was "16 . . . going on 17" when he and his family moved to Richmond Heights. According to Coates, in November 2018, he was robbed at gunpoint at a bus stop. The thief took Coates' cell phone and shoes. Coates' testimony about this incident mirrors Johnson's testimony. Johnson took Coates to the police station where Coates filled out a police report. Coates began attending Richmond Heights High School, which was a five-minute walk from his house.

{¶ 51} According to Coates, he had "real, real bad anxiety" and "was really, like, paranoid about things" after being robbed. Coates testified that he agreed with Johnson that his behavior had changed after being robbed and that he did not agree to seek professional help. According to Coates, he was constantly worried that something would happen to him and his family. Coates testified that he tried various things "to see if anything would help" with his anxiety, including holding healing crystals and burning sage throughout the house. Coates further testified that "towards the end of 2020," his stepdad was robbed at gunpoint and, in 2023, his younger brother was robbed at gunpoint.

{¶ 52} Coates moved into the Harland Avenue house in March 2023 with Willie and Jermaine Bradley. In May 2023, Coates was driving his cousin Glen's car on I-77, when someone began shooting from a car that appeared on the left. According to Coates, more than ten bullets struck the car he was driving. Coates called Glen and Johnson. After this, Coates moved in with Johnson for a couple of months and then moved back to the Harland Avenue house. Coates testified that this car shooting affected his anxiety "very — very — a lot." According to Coates, his anxiety became worse after each violent incident in which he was involved.

{¶ 53} Coates "had thoughts" that he "might have needed help," but he was "always in [his own] head about certain things," and he did not think therapy would work. Coates confirmed that Johnson told him to seek help.

{¶ 54} According to Coates, when he moved back into the Harland Avenue house, Willie was in jail and Jermaine no longer lived there. Wright and her young child were living in the house. Coates testified that he has known Wright since he was "about ten or eleven years old" when Wright and Willie began dating. There was no discussion with Wright about Coates moving back into the Harland Avenue house prior to him doing so.

{¶ 55} According to Coates, in October 2023, he and Wright would spend the night at the Harland Avenue house "often." In the middle of November, "it changed." Wright would not spend the night at the Harland Avenue house as often. "[T]ypically she . . . would come there and then be gone for a couple of days . . . ." Coates testified that he did not know where Wright was staying when she was not

staying at the Harland Avenue house. According to Coates, Wright would communicate with him via text or call "when she would . . . come home after a couple of days . . . ."

{¶ 56} Coates testified that Wright either lost, or misplaced, her keys multiple times and typically, Wright would text Coates to let her in the house. According to Coates, having a key to his house "floating around" caused him anxiety.

{¶ 57} Coates testified that he bought a gun on November 22, 2023, "[f]or protection." Coates further testified that he had "a lot of anxiety about . . . someone possibly gaining entry or breaking into my home." Specifically, Coates testified that the gun he bought was an AR-15. Asked about his relationship with Wright between November 22, 2023, when he bought the gun, and December 14, 2023, when he shot and killed Wright, Coates answered, "We're still cool."

{¶ 58} Coates testified that during this three-week period, he spent the night at the Harland Avenue house "every night." According to Coates, Wright "would be gone for . . . a week or days at a time." At some point in December, Wright explained to Coates that she would stay closer to her school. Coates had "an understanding" that Wright was planning to move out of the Harland Avenue house sometime in December.

{¶ 59} Coates testified that he last saw Wright "[p]robably about three, four days" before the shooting. Coates further testified that he was not expecting Wright to come to the Harland Avenue house in the early morning hours of December 14, 2023.

{¶ 60} According to Coates, he FaceTimed with his girlfriend Mariana starting at just past midnight on December 14, 2023, and that conversation lasted for three hours and 12 minutes. During this time, Coates was on the couch in the living room. After about an hour, Mariana fell asleep and Coates was searching the internet on his phone. At 1:36 a.m., he conducted the following search: "Are you allowed to shoot someone who's trying to break into your house." Coates testified that he was "anxious" about "[s]omeone possibly breaking in" and he "wanted to know how certain . . . things would work of that nature." At some point, Coates fell asleep on the couch.

{¶ 61} Coates testified that the next thing he remembered was "hearing something at the door." Coates clarified that he heard "someone . . . picking the doorknob or something." According to Coates, the doorbell camera system at the Harland Avenue house "rings . . . when someone enters the property." Coates heard this ring in the early morning hours of December 14, 2023. Coates testified that the ring woke him up, "but it was the picking at the knob that got [him] startled." Coates testified that he "thought it was late, that somebody could be breaking in." Coates further testified that he "had already previously been worried about it" and he "was already having anxiety about it."

{¶ 62} Coates testified that he "got up off the couch" and "grabbed" his gun, which was "[p]ropped on the side of the couch." Coates testified that he "thought somebody was breaking in." Coates did not "check the security camera monitor . . . that's mounted in the living room" because he was "terrified" and "worried about

someone breaking into the house." According to Coates, at that moment, he did not think it could have been Wright at the door. Rather, Coates testified that he "thought it was an intruder."

{¶ 63} After picking up his rifle, Coates went toward the front door and "[b]egan to fire shots." Asked how many shots he fired, Coates answered, "I can't really recall. I just know it was a reaction." According to Coates, his "thought process" was that "somebody was trying to break into the house." Coates further testified that he could see from the FaceTime call that Mariana was awake at that point. Coates told her that someone was trying to break into his house and he ended the call. Coates testified that he then called Twalann "more than three" times. Asked why there were multiple calls, Coates replied, "Because I learned that it wasn't an — it wasn't the intruder, it was" Wright. Coates testified that he "learned" this while he was on the phone with Twalann, although he did not testify as to how he "learned" this information. Coates also testified that he "heard the baby crying . . . from outside on the front porch." After hearing the baby crying, Coates thought that he had made a mistake. Coates testified that, had he known that it was Wright at the door, he would not have fired his gun.

{¶ 64} While on the phone with Twalann, Coates watched the video from the security camera monitor in the living room. Coates testified that he saw Wright's face and it "crushed" him.

{¶ 65} After speaking with Twalann, Coates called the police from Willie's phone because Coates' phone "had died."

{¶ 66} Under cross-examination, Coates was asked if Wright was "free to come and go as she pleases," and Coates replied, "Correct." Coates further agreed that Wright was living in or, as he put it, "staying at" the Harland Avenue house at the time of the shooting.

{¶ 67} According to Coates, the doorbell security camera "lost connection with the server" on either November 25, 2023, or December 11, 2023, because the "bill wasn't paid . . . ." Coates testified that the monitor "makes a noise" when someone crosses a threshold on the property. Coates further testified that "[s]ometimes [the monitor] would go to the live feed, sometimes it wouldn't." According to Coates, this was because the "bill hadn't been paid." Asked if the monitor "could give you live footage of what's outside when it's activated," Coates replied, "Correct." Asked what woke him up, Coates testified as follows: "So I was alarmed by the ping, but the — you know, the picking at the door is what made me feel like it was an intruder."

{¶ 68} The following colloquy occurred about what happened next:

Q:    Did you ever go to that panel and even look before you went to the door?

A:    No.

Q:    No. Why not?

A:    Because I was scared.

Q:    Well, Mr. Coates, I don't want to sound flippant, but what's the point in having a security system if you're not going to rely on it in situations like this?

A:     Because it was 3:00 in the morning and I thought an intruder was on my property.

**{¶ 69}** When Coates was interviewed by the police after the shooting, he told them that he "fired warning shots." At trial, Coates explained that he "should have phrased it different[ly]" and his firing the shots "was pretty much a reaction to what [he] thought was going on."

**{¶ 70}** The prosecutor established, during cross-examination, that Coates told the operator on the 911 call that he "thought" it was an intruder at the front door, even though, during Coates' direct examination, he testified that he looked at the monitor after hearing a baby cry and saw Wright. According to Coates, this occurred while he was talking to Twalann on the phone and before he called 911. Coates did not leave the house to check on Wright or her infant son at any point before the police escorted him outside at 3:40 a.m. According to Coates, he "was in a deep shock" after learning that he shot Wright.

**{¶ 71}** On redirect examination, Coates testified that he had "a bad case of paranoia" at the time of the shooting. "That was something I always kind of had, it just — certain things could build, you know, kind of like my — my anxiety, you know, and her losing keys and, you know, me constantly thinking I'm hearing things at the door or me hearing things outside." In response to being asked why he referred to this incident as an accident, Coates stated as follows:

> Because I would never — I would — I would never do anything like that. I never had any intentions like that toward her. So — it was — basically what I'm saying is that what I had done was a reaction to what I thought

was going on.  And afterwards, when I learned who was on the other side, that's when I learned that it was a huge mistake that I'll forever regret.

### 4. Charles Heller, Ph.D.

{¶ 72} Dr. Charles Heller testified that he is a clinical and forensic psychologist.  According to Dr. Heller, PTSD is an abbreviation for post-traumatic stress disorder and manifests through "nightmares, difficulty sleeping, irritability, anxiety and depression . . . .  It's a serious problem.  It's difficult to treat.  And many people who have it don't get treatment."  Dr. Heller testified that, if left untreated, PTSD is "likely to get worse.  It doesn't go away by itself."  According to Dr. Heller, people will experience PTSD "[f]or the rest of their life if they don't have treatment."  Asked to explain who can be affected by PTSD, Dr. Heller testified as follows:

> Everyone is susceptible to PTSD.  It's quite common.  And it happened to me.  I was in a very severe car accident, and it brings up memories and fears whenever I get into a car.

> So accidents, near death experiences, or seeing other people in those situations can cause PTSD.  It creates images in a person's mind that are always there.  And they get triggered by certain situations or what they see or hear or what they smell.  Things will remind them of the situation.

{¶ 73} Asked to describe "the effect of somebody that experiences PTSD when they're triggered," Coates answered as follows:

> Well, when someone is triggered by some stimulus in their life, in their environment, in a situation, they become anxious, as if that episode, that trauma is occurring again.  They can have a flashback, which seems almost real, even though they know it's not real, and it — it runs across their minds.  And they go back to that original trauma, the feeling of that trauma, what they felt like when they were going through it.

{¶ 74} Dr. Heller further testified that PTSD can cause "changes that affect people in terms of their behavior, and their memory, and their impulse control . . . ."

{¶ 75} Dr. Heller testified that he was retained by the defense to provide an opinion in this case. He reviewed the file, including police reports and videos of the police interviewing Coates. Dr. Heller also interviewed Coates on two occasions. Dr. Heller determined that Coates suffered traumatic events in his past, including being robbed at gunpoint when he was 16 years old and "growing up in a war zone" with "a lot of fear," hearing "shots being fired" and seeing "people fighting, not controlling their tempers." Dr. Heller testified that Coates' stepfather and brother were also robbed, and this "frightened him even more." Dr. Heller further testified that a "few years later [Coates] was driving his cousin's car and some people pulled alongside and shot at the car. And he felt like he was under attack. And seeing the bullet holes in the window and in the car kind of cemented his memory of being in danger."

{¶ 76} According to Dr. Heller, this was "significant" and "can lead to an underlying condition of anxiety." Dr. Heller testified that these incidents were "a major trauma for" Coates and "he became more hypervigilant, more worried about getting hurt, getting robbed again, or killed." Dr. Heller testified that "hypervigilance is a state of what we call high arousal, where a person is very sensitive to situations that could occur, that are similar to the trauma that he went through or she went through. So they're more — they're more worried about things, seriously worried."

{¶ 77} Dr. Heller diagnosed Coates with complex PTSD, which involves more than one single traumatic event. Dr. Heller also opined that Coates' PTSD was "severe, and that he was not exaggerating . . . ." Dr. Heller continued his testimony as follows:

> My professional opinion is that Mr. Coates has a severe form of post traumatic stress disorder based upon the material that I gleaned from this evaluation, and that his form of PTSD, which is complex, is very close to the top 25 percent in terms of severity of all people who have been diagnosed with PTSD because his life was in danger several times. And that's similar to what happens to a soldier. Not quite as terrible as what happens to a soldier, but it affected him very closely to that.

{¶ 78} Under cross-examination, Dr. Heller agreed that "the number of diagnoses for PTSD has certainly grown over the course of the last 30 or 40 years." He also agreed that a person can have anxiety or paranoia without being diagnosed with PTSD. Additionally, Dr. Heller testified that as "a general principle," people "are responsible for [their] own actions or inactions."

## III. Jury Instructions

{¶ 79} After both sides rested their cases, the court instructed the jury on self-defense, pursuant to *Ohio Jury Instructions*, CR § ("OJI") 421.21, as follows:

> Self-defense — use of deadly force. The defendant is allowed to use deadly force in self-defense. The State must prove beyond a reasonable doubt that the defendant, when using deadly force, did not act in self-defense.
>
> State's proof. To prove that the defendant, when using deadly force, did not act in self-defense, the State must prove beyond a reasonable doubt at least one of the following:
>
> The defendant was at fault in creating the situation giving rise to the death of Di'Mesha Wright; or

The defendant did not have reasonable grounds to believe that he was in imminent and/or immediate danger of death or great bodily harm; or

The defendant did not have an honest belief, even if mistaken, that he was in imminent and/or immediate danger of death or great bodily harm; or

The defendant used unreasonable force.

{¶ 80} The court further instructed the jury on the castle doctrine, relating that Coates had "[n]o duty to retreat. The defendant had no duty to retreat before using force in self-defense if the defendant was in a place in which he lawfully had a right to be."

{¶ 81} The court elaborated in its jury instruction about "unreasonable force," stating that a "person is allowed to use force that is reasonably necessary under the circumstances to protect himself from an apparent danger. For you to find the defendant guilty, the State must prove beyond a reasonable doubt that the defendant used more force than reasonably necessary and that the force used was greatly disproportionate to the apparent danger."

## IV. Law and Analysis

{¶ 82} We address Coates' assignments of error out of numerical order for ease of discussion.

### A. Jury Instructions

#### 1. Standard of Review

{¶ 83} Appellate courts review a trial court's decision to provide or not provide specific jury instructions under an abuse-of-discretion standard. *State v.*

*Guster*, 66 Ohio St.2d 266, 271 (1981). An abuse of discretion occurs when a court exercises its judgment "in an unwarranted way in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. However, "[w]hether jury instructions correctly state the law is a legal issue that an appellate court reviews de novo." *State v. Echevarria*, 2018-Ohio-1193, ¶ 27 (8th Dist.). For a jury-instruction error to be reversible, the defendant must also show prejudice. *Id*. at ¶ 29.

{¶ 84} Trial courts are required to "fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 210 (1990). "In determining whether . . . sufficient evidence exists in the record to support the giving of a proposed jury instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *State v. Hinton*, 2014-Ohio-490, ¶ 34 (8th Dist.). "However, a trial court does not err in failing to instruct the jury on an affirmative defense where the evidence is insufficient to support the instruction." *Id*. "In general, a trial court should give a requested jury instruction if it is a correct statement of the law and reasonable minds might reach the conclusion sought by the instruction." *Echevarria* at ¶ 28.

## 2. Self-Defense and the Castle Doctrine

{¶ 85} In *State v. Messenger*, 2022-Ohio-4562, ¶ 1, the Ohio Supreme Court held that "when a defendant presents a claim of self-defense in a criminal case, the

state has the burden of disproving that self-defense claim beyond a reasonable doubt." *See also* R.C. 2901.05(B)(1) (stating that "the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense"). To present a claim for self-defense, a defendant must show that he (1) "was not at fault in creating the situation giving rise to the affray"; (2) "had a bona fide belief that he was in imminent danger of death or great bodily harm and . . . his only means of escape from such danger was in the use of such force" and (3) "did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). The State, on the other hand, "need only disprove one of the elements of self-defense to sustain its burden at trial" that the defendant was not acting in self-defense. *State v. Walker*, 2021-Ohio-2037, ¶ 14 (8th Dist.).

{¶ 86} R.C. 2901.09(B), also known as the "castle doctrine," creates an exception to the third prong of the self-defense test, i.e., the general duty to retreat: "a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be." The castle doctrine effectively negates the third element of the *Barnes* self-defense test if the defendant acts from "a place in which [he] lawfully has a right to be." *Echevarria*, 2018-Ohio-1193, at ¶ 38.

{¶ 87} R.C. 2901.05(B)(2) creates a rebuttable presumption that a person acts in self-defense when using force "if the person against whom the defensive force is used is . . . unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered" the defendant's residence. Pursuant to

R.C. 2901.05(B)(3)(a), this presumption does not apply if the "person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence . . . ."

{¶ 88} In *State v. Lewis*, 2012-Ohio-3684, ¶ 18 (8th Dist.), this court explained that the "difference between the Castle Doctrine and the rebuttable presumption of self-defense lies in the legal status of the victim." In *Echevarria* at ¶ 33, this court further explained as follows:

> If the victim was lawfully in the defendant's residence at the time the defendant used force against the victim, the defendant would not be entitled to the presumption of self-defense. . . . However, the castle doctrine would still apply, i.e., the defendant would have no duty to retreat from the residence if the defendant were lawfully occupying the residence at the time he or she used the force.

*See also State v. Reid*, 2019-Ohio-1542, ¶ 27 (1st Dist.) ("Under the rebuttable presumption of self-defense, if the jury had found that [the victim] was unlawfully and without privilege in [the defendant's] apartment, then [the defendant] would have been entitled to a presumption that she acted in self-defense. . . ."); *State v. Claren*, 2020-Ohio-615, ¶ 26 (9th Dist.) ("[I]t appears that the court may have conflated the castle doctrine with the statutory presumption of self-defense that may arise in certain instances.").

{¶ 89} In Coates' first assignment of error, he argues that the "trial court erred in not allowing the jury to consider the castle doctrine and the specific presumption that . . . Coates enjoyed if he believed his home was being invaded by an intruder." We note that the court instructed the jury on the castle doctrine in this

case.  Therefore, we focus our analysis on the court not instructing the jury regarding the presumption of self-defense as stated in R.C. 2901.05(B)(2).

{¶ 90} In this case, the court instructed the jury as to self-defense by reading OJI 421.21(A), (B), (C) and (E).  The court did not instruct the jury on OJI 421.21(D), which states that "the defendant violated a duty to retreat to avoid the danger . . ." and the court did not instruct the jury about the rebuttable presumption of self-defense found in OJI 421.23.  Additionally, as noted, the court instructed the jury regarding the castle doctrine.[1]

{¶ 91} According to Coates' argument on appeal, the trial court made the determination that both Coates' and Wright's status at the Harland Avenue house was lawful and they both had a right to be in the residence.  Coates argues that these determinations should have been made by the jury.  Specifically, Coates argues that the trial court should have read OJI 421.23, which concerns the rebuttable presumption of self-defense, to the jury:

> The defendant is presumed to have acted in . . . self-defense . . . when using defensive force that was intended or likely to cause death or great bodily harm to another if the person against whom the defensive force

---

[1] Both parties to this appeal appear to be operating under an incorrect understanding of the castle doctrine.  The State argues in its appellate brief that "the trial court correctly decided to omit the Castle Doctrine instruction from being submitted to the jury."  Coates argues in his appellate brief that, "[h]ad the jury, as requested by the defense, been given the Castle Doctrine instruction . . ., the jury might well have found Mr. Coates not guilty."  In this case, the trial court instructed the jury regarding the castle doctrine, which is codified in R.C. 2901.09(B) and states that "a person has no duty to retreat before using force in self-defense . . . if that person is in a place in which the person lawfully has a right to be."   As explained previously in this opinion, the castle doctrine involves whether a defendant has a duty to retreat.  The rebuttable presumption of self-defense, on the other hand, involves whether the victim was lawfully on the premises.

was used . . . was in the process of entering . . ., unlawfully and without privilege to do so, the . . . residence . . . occupied by the defendant.

{¶ 92} Upon review, we find that the court acted within its discretion when it did not instruct the jury regarding the presumption of self-defense. After reviewing the record, we find that there was insufficient evidence presented at trial to support this jury instruction. All evidence in the record shows that Wright was lawfully entering the Harland Avenue house when Coates shot and killed her. Wright had been living there since August 2023 and Coates knew Wright was living there because he had been living there, with her, since October 2023. Although Wright sometimes spent the night elsewhere, she had a key to the house, both her and her child's belongings were there and Wright and Coates often texted about lost or forgotten keys as well as to who was coming home when. All evidence in the record leads to the conclusion that Wright had the privilege to lawfully enter, or attempt to enter, the Harland Avenue house on December 14, 2023 at approximately 3:20 a.m. In other words, the record does not contain evidence from which reasonable minds could conclude that Wright was unlawfully entering the Harland Avenue house when Coates shot and killed her. Therefore, the presumption of self-defense jury instruction was not relevant based on the testimony elicited and evidence admitted at Coates' trial.

{¶ 93} Furthermore, assuming arguendo that the court erred by failing to instruct the jury regarding the presumption of self-defense, the error would be harmless because there is overwhelming evidence in the record that Coates was at

fault in creating the situation that resulted in Wright's death. Wright was coming home, with her child in her arms, when Coates fired 14 shots through the closed front door without looking at the doorbell camera video to see who was there. Coates was the initial and sole aggressor in this case, and the State disproved the first element of the self-defense test. *See, e.g., State v. Cassano*, 2002-Ohio-3751, ¶ 74-75 (finding harmless error in instructing the jury on the duty to retreat when the defendant "was at fault in creating the situation leading to the affray"); *State v. Hargrave*, 2012-Ohio-798, ¶ 19 (4th Dist.) ("[T]he evidence demonstrated [the defendant] was the aggressor and was not entitled to the privilege of self-defense."); *State v. Williamson*, 2011-Ohio-4095, ¶ 15 (8th Dist.) (Defendant's murder conviction affirmed because, in part, "the evidence supported the state's contention that [the defendant] was the aggressor.").

{¶ 94} Accordingly, Coates' first assignment of error is overruled.

### 3. "Unreasonable" Deadly Force

{¶ 95} As stated earlier in this opinion, the trial court instructed the jury, pursuant to OJI 421.21(E), that if the State proved that Coates used unreasonable force, Coates did not act in self-defense.

{¶ 96} In Coates' fourth assignment of error, he argues that "because there is no question that [his] case was always a deadly force case, it was inappropriate to instruct on unreasonable force." Coates' specific argument under this assignment of error is somewhat unclear from his appellate brief, hence, we quote him directly:

> There is no question that a person defending their home can use deadly force. The question in this case is whether . . . Coates, under the

circumstances and with his characteristics, reasonably believed that he needed to defend his home . . . .

But there is no issue about whether he was required to use less than deadly force — either deadly force was allowed to defend his home or no force was allowed because there was no need to defend his home. Anything less than deadly force should not have been an issue.

. . .

But, if one is otherwise justified in using deadly force, what is "unreasonable" or disproportionate deadly force? To be sure, there will be times when a deadly threat has been quelled and deadly force is no longer necessary. But that is covered by the requirement that the defendant's employment of deadly force is unreasonable. But that is not what the trial court said — rather, the trial court said that, even if the jury finds the defendant's belief that there is imminent danger is still reasonable and sincere, the deadly force must be reasonable and not disproportionate. Respectfully, this makes no sense.

{¶ 97} To support this assignment of error, Coates cites a 2022 case from the Alaska Supreme Court. In *Jones-Nelson v. State*, 512 P.3d 665 (2022), the court held that Alaska's self-defense statutes

require that the person using force in self-defense reasonably believe that the force is necessary and that the person reasonably believe that the other person is using unlawful force. The plain language of [the] statutes makes clear that if either of these beliefs is unreasonable at the time the person uses force in self-defense, then the use of force in self-defense is not permitted. Nothing in the plain language of [the statutes] even implies an additional reasonable belief about the level of deadly force necessary to defend against death or serious physical injury.

*Id.* at 674.

{¶ 98} The *Jones-Nelson* Court further explained that "deadly force" is "a singular degree or level of force . . . rather than a spectrum of degrees of deadly

force." *Id.* In other words, the term "level of force" explains "the dichotomy between deadly and nondeadly force." *Id.* "Alaska law recognizes only two categories of force: nondeadly and deadly. It is a binary choice: either the force used is deadly or it is not." *Id.* at 675.

{¶ 99} Our review of the record shows that the court instructed the jury, in accordance with Ohio law, that if the State proved beyond a reasonable doubt that Coates "used unreasonable force," this would also prove that Coates did not act in self-defense. This "unreasonable force" jury instruction is found in OJI 423.21(E), which is titled "Self-defense, defense of residence — use of deadly force R.C. 2901.05." Furthermore, this court has stated that the "amount of force used in self-defense . . . must be reasonable . . . . Where one uses a greater degree of force than is necessary under all the circumstances, it is not justifiable on the grounds of self-defense . . . . The issue of whether a defendant used unreasonable force in repelling a perceived danger is a question of fact for the jury." *State v. Taslitz*, 2015-Ohio-3474, ¶ 20 (8th Dist.).

{¶ 100} We find no abuse of discretion in the trial court's instructing the jury regarding unreasonable force. The jury instruction at issue is a correct statement of Ohio law and relevant to the facts adduced at Coates' trial. Furthermore, as stated earlier, there is overwhelming evidence in the record that Coates was at fault in creating the situation that led to Wright's death. Therefore, any error in another portion of the self-defense jury instructions would be harmless. Accordingly, Coates' fourth assignment of error is overruled.

## 4. Lesser-Included Offenses

{¶ 101} In Coates' second assignment of error, he argues that the trial court erred by failing to instruct the jury on the following lesser-included offenses: reckless homicide in violation of R.C. 2903.041 as to the charge of murder; involuntary manslaughter in violation of R.C. 2903.04(B) as to the charge of felony murder; and two counts of assault in violation of R.C. 2903.13(B) as to the two counts of felonious assault.

{¶ 102} Coates argues that "[i]n each count, the distinction between the charged offense and the requested lesser-included offense was that the charged offense carried a mens rea of 'purposely' . . . or 'knowingly' . . ., while the requested lesser included offense carried a mens rea of 'recklessly.'" Coates' attorney explained his position more thoroughly in the trial court during a hearing on motions in limine.

> Judge, our position as it relates to the matter of recklessness is that would be relevant to the theory that he was reckless in his determination as to whether the person on the other side of the door was a privileged individual or not.
>
> We acknowledge that his conduct in pulling the trigger multiple times here was a voluntary intentional act. But the — again, our whole theory, as we've articulated earlier as part of our request for the mistake of fact instruction and the Castle Doctrine instruction, is that he believed that the person on the other side of the door was [not] a privileged person.
>
> He did not take steps prior to firing the gun. For example, viewing the security camera footage. He did not take steps to determine who was on the other side of the door. That could be deemed reckless conduct. And that is what we believe is why he would be entitled to the lesser that essentially are predicated on recklessness. And that would apply both to the assaults, i.e. recklessly causing serious physical harm, as well as the reckless homicide lessers.

{¶ 103} Pursuant to R.C. 2945.74, "[w]hen the indictment . . . charges an offense, including different degrees, . . . the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense." *See also* Crim.R. 31(C). "A criminal defendant is entitled to a lesser-included-offense instruction . . . only where the evidence warrants it." *State v. Kidder*, 32 Ohio St.3d 279, 280 (1987). The *Kidder* Court additionally concluded that, regarding lesser-included offenses, "the trial court's task is twofold: first, it must determine what constitutes a lesser included offense of the charged crime; [and] second, it must examine the facts and ascertain whether the jury could reasonably conclude that the evidence supports a conviction for the lesser offense and not the greater." *Id*.

{¶ 104} "An offense may be a lesser included offense of another only if (i) the offense is a crime of lesser degree than the other, (ii) the offense of the greater degree cannot be committed without the offense of the lesser degree also being committed and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." *State v. Wilkins*, 64 Ohio St.2d 382, 384 (1980).

### a. Reckless Homicide

{¶ 105} Coates argues that the trial court should have instructed the jury on reckless homicide in violation of R.C. 2903.041(A), which states that "[n]o person shall recklessly cause the death of another . . ." as a lesser included offense of murder in violation of R.C. 2903.02(A), which states that "[n]o person shall purposely cause the death of another . . . ."

{¶ 106} This court has held that "reckless homicide is a lesser-included offense of murder." *State v. Thorpe*, 2021-Ohio-1295, ¶ 18 (8th Dist.). *See also State v. Chatmon*, 2013-Ohio-5245, ¶ 31 (8th Dist.).

{¶ 107} The issue under this argument is whether Coates caused Wright's death purposefully or recklessly. A person acts purposefully when he specifically intends to cause a certain result. R.C. 2901.22(A). A person acts recklessly "when, with heedless indifference to the consequences," he "disregards a substantial and unjustifiable risk that" his "conduct is likely to cause a certain result . . . ." R.C. 2901.22(C).

{¶ 108} Ohio courts consistently hold that "a defendant may be guilty of reckless homicide for an unintentional shooting if the evidence supports a finding that he handled a firearm in a reckless manner, resulting in another person's death." *State v. Erby*, 2018-Ohio-3695, ¶ 20 (2d Dist.). *See also State v. Perrien*, 2020-Ohio-798, ¶ 73 (8th Dist.) (Defendant's reckless homicide conviction affirmed when the evidence showed "it was reckless for [him] to have his finger on or around the trigger while he was 'joking around' with the victim" and the gun discharged.); *State v. Howse*, 2012-Ohio-6106, ¶ 43 (9th Dist.) (Defendant's reckless homicide conviction affirmed when the evidence showed he "cocked the gun and pointed it at [the victim], and the gun accidentally went off."); *State v. Gough*, 2009-Ohio-322, ¶ 21-22 (5th Dist.) (Defendant's reckless homicide conviction affirmed when the evidence showed he was intoxicated, and although he thought the gun was

unloaded, he "picked the gun up, pointed the gun at [the victim's] head, cocked the gun and pulled the trigger.").

{¶ 109} The evidence presented at trial in this case demonstrated that Coates purposely pulled the trigger of a loaded gun 14 times, aiming at his closed front door, while believing someone was on the other side. There is no question that Coates intended to kill whomever was there. Whether he thought that person was an intruder or his housemate is not the deciding factor that transforms a purposeful murder into a reckless homicide. "A jury may presume an intention to kill where the natural and probable consequence of a defendant's act is to produce death and the jury may conclude from all of the surrounding circumstances that a defendant had an intention to kill." *State v. Edwards*, 26 Ohio App.3d 199, 200 (10th Dist. 1985). *See also State v. Brown*, 1996 Ohio App. LEXIS 801 (8th Dist. Feb. 29, 1996) ("The act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence.").

{¶ 110} Upon review, we find that the jury could not have reasonably concluded that the evidence in this case supports the acquittal of purposeful murder and the conviction of reckless homicide. As such, we find no abuse of discretion in the court's decision to not instruct the jury on reckless homicide.

### b. Assault

{¶ 111} Coates argues that the court should have instructed the jury on assault in violation of R.C. 2903.13(B), which states that "[n]o person shall recklessly cause serious physical harm to another" as a lesser-included offense of felonious

assault in violation of R.C. 2903.11(A)(1), which states that "[n]o person shall knowingly . . . [c]ause serious physical harm to another," and R.C. 2903.11(A)(2), which states that "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another . . . . by means of a deadly weapon . . . ."

{¶ 112} Pursuant to R.C. 2901.22(B), a "person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶ 113} Ohio courts have held that assault in violation of R.C. 2903.13(B) is a lesser-included offense of felonious assault. *State v. McPherson*, 2010-Ohio-64, ¶ 7 (8th Dist.); *State v. Tolle*, 2015-Ohio-1414, ¶ 10 (12th Dist.).

{¶ 114} Similar to our analysis of the difference between murder and reckless homicide, this argument hinges on whether Coates knowingly or recklessly fired the gun resulting in either serious physical harm or physical harm to Wright. We use the same reasoning to conclude that the evidence in the record does not lead to a finding that Coates acted recklessly, rather than knowingly, when he fired his assault rifle.

{¶ 115} Therefore, we find no abuse of discretion in the court's decision to not instruct the jury regarding assault.

### c. Involuntary Manslaughter

{¶ 116} Coates argues that the court should have instructed the jury on involuntary manslaughter in violation of R.C. 2903.04(B), which states that "[n]o person shall cause the death of another . . . as a proximate result of the offender's

committing or attempting to commit a misdemeanor . . .," as a lesser-included offense of felony murder in violation of R.C. 2903.02(B).

{¶ 117} Ohio courts have held that involuntary manslaughter is a lesser-included offense of felony murder. *State v. Waters*, 2019-Ohio-1813, ¶ 12 (6th Dist.); *State v. Trimble*, 2009-Ohio-2961, ¶ 185.

{¶ 118} Because we found no evidence that Coates committed misdemeanor assault, rather than felonious assault, a jury instruction regarding involuntary manslaughter was not warranted in this case. Coates was not charged with a misdemeanor and there is no evidence in the record that he committed a misdemeanor. Therefore, the court did not abuse its discretion when it did not instruct the jury regarding involuntary manslaughter.

{¶ 119} Accordingly, Coates' second assignment of error is overruled

## B. Expert Testimony Regarding Post-traumatic Stress Disorder

{¶ 120} In Coates' third assignment of error, he argues that "the trial court erred when it prevented the defense from presenting expert testimony about how . . . Coates' PTSD could affect a person confronted with the circumstances that . . . Coates [was] confronted [with] at the time of the alleged offenses." Specifically, Coates argues that the trial court prevented his expert witness, Dr. Heller, from testifying that Coates' "belief that he was in danger was reasonable and honestly held . . . ." Coates further argues that because "testimony about a defendant's mental state at the time of an offense is not, per se, inadmissible, the trial court erred in limiting Dr. Heller's testimony."

{¶ 121} The State, on the other hand, argues that Dr. Heller's testimony regarding Coates' state of mind at the time of the shooting was inadmissible under Evid.R. 702(A) because this issue is "within the ken of the jury." The State further argues that whether Coates "had a bona fide belief that he was in imminent danger of death or great bodily harm . . . is a subjective test . . . usually best established by the testimony of the defendant." According to the State, "[e]xpert testimony ordinarily may not be admitted to establish a self-defense claim." The State additionally argues that "expert testimony from a psychologist or psychiatrist is inadmissible for purposes unrelated to the insanity defense," battered woman syndrome or battered child syndrome.

{¶ 122} In this case, the trial court issued a journal entry prior to trial granting, in part, the State's motion in limine to limit the expert testimony of Dr. Heller, finding: "The expert is limited in his testimony and is precluded from testifying as to the defendant's state of mind in support of his self-defense claim and an opinion as to the self-defense claim. The expert witness may testify as to the defendant's diagnosis."

{¶ 123} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion is "a court exercising its judgment, in an unwarranted way, in regard to a matter over which is has discretionary authority." *Abdullah*, 2021-Ohio-3304, at ¶ 35. Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶ 124} Evid.R. 702 governs expert witness testimony, and it states, in part, as follows:

> A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:
>
> (A) The witness' testimony . . . relates to matters beyond the knowledge or experience possessed by lay persons . . .
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case . . . .

{¶ 125} "Courts should favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207 (1998). *See also Terry v. Caputo*, 2007-Ohio-5023, ¶ 24 ("This gatekeeping function imposes an obligation upon a trial court to assess both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify.").

{¶ 126} Additionally, Evid.R. 704 states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it

embraces an ultimate issue to be decided by the trier of fact." The staff notes to this evidence rule state, in part, that "[o]pinion testimony on an ultimate issue is admissible if it assists the trier of fact, otherwise it is not admissible."

{¶ 127} In *State v. Koss*, 49 Ohio St.3d 213, 218 (1990), the Ohio Supreme Court held that, "[w]here the evidence establishes that a woman is a battered woman, and when an expert is qualified to testify about the battered woman syndrome, expert testimony concerning the syndrome may be admitted to assist the trier of fact in determining whether the defendant acted in self-defense." Specifically, the *Koss* Court found that the purpose of this testimony "is to assist the trier of fact [in] determin[ing] whether the defendant acted out of a[n] honest belief that she was in imminent danger of death or great bodily harm and that the use of such force was her only means of escape." *Id*. at 217.

{¶ 128} In *Nemeth*, 82 Ohio St.3d at 207, the Ohio Supreme Court extended this line of reasoning to battered child syndrome and held the following:

> Evidence that would support a defendant's explanation of the events at issue and would provide evidence as to his possible state of mind at the time of the incident is clearly relevant to his or her defense. In this case the testimony on battered child syndrome, which was proffered by the defense, is relevant for at least four separate purposes, including the determination of whether [the defendant] (1) had acted with prior calculation and design as charged in the indictment, (2) had acted with purpose as required for the lesser included offense of murder, (3) had created the confrontation or initiated the aggression, and (4) had an honest belief that he was in imminent danger, a necessary element in the affirmative defense of self-defense.
>
> . . .
>
> Expert testimony on battered child syndrome would, in this case, tend to enhance the probability that [the defendant's] account of the facts

leading up to the killing was truthful and would lend credibility to his assertion that he was in a state of rage and dissociation at the time of the killing. A diagnosis of battered child syndrome and an explanation of its effects would therefore be relevant in determining whether the case warranted a jury charge on voluntary manslaughter.

{¶ 129} In the case at bar, Coates argues that this reasoning extends to PTSD and, therefore, the trial court erred by limiting his expert's testimony. Dr. Heller testified in this case about PTSD in general and about how PTSD can affect people, including making them more anxious, paranoid and hypervigilant. Dr. Heller was prohibited from testifying about Coates' specific state of mind at the time he shot and killed Wright. This is in line with *Koss* and *Nemeth*, in which the expert testimony at issue was limited to an explanation of the pertinent mental-health syndrome and the defendant's diagnosis of the same. Neither *Koss* nor *Nemeth* take the issue as far as Coates is suggesting we go in this appeal. Therefore, we find that Coates' argument goes beyond the boundaries of *Koss* and *Nemeth*, which dealt with expert witness testimony concerning an explanation and a diagnosis of battered woman syndrome and battered child syndrome.

{¶ 130} In this case, the trial court permitted Coates' expert witness to testify about an explanation of PTSD in general, the effects of PTSD in general and Coates' diagnosis of PTSD. This satisfies the framework of admissible expert testimony set forth in *Koss* and *Nemeth*. On appeal, Coates argues that his expert should have been allowed to testify to more, namely "whether someone with . . . Coates' background could reasonably believe he was in imminent danger."

{¶ 131} However, we need not decide this issue because the evidence presented at trial showed that Coates was the initial and sole aggressor in the situation leading to Wright's death. If the court abused its discretion by limiting Coates' expert testimony, it would be a harmless error because Coates' self-defense claim fails. *See State v. Napier*, 2017-Ohio-246, ¶ 29 (12th Dist.) ("Even assuming Napier had sufficiently proven the second element of self-defense by presenting evidence regarding his PTSD and prior military service, the trial court found that Napier would have failed to establish the first element of self-defense because Napier was clearly at fault in creating the situation giving rise to the affray . . . .").

{¶ 132} Accordingly, Coates' third assignment of error is overruled.

{¶ 133} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

MICHELLE J. SHEEHAN, J., and
MARY J. BOYLE, J., CONCUR